Clarence RASMUS, Plaintiff,

v.

A. O. SMITH CORPORATION, a corporation, Defendant.

Civ. No. 962.

United States District Court
N. D. Iowa, W. D.
Jan. 13, 1958.

⚷441(9)

Justus R. Miller (of Miller, Miller & Miller), Cherokee, Iowa, for plaintiff.

John W. Gleysteen, Eskil M. Nelson (of Harper, Gleysteen & Nelson), Sioux City, Iowa, Norman Quale, Milwaukee, Wis., for defendant.

GRAVEN, District Judge.

In this action the plaintiff seeks to recover damages for breach of warranty in connection with the sale to him by the defendant of a structure designed for farm storage purposes. The trial was to the Court. The plaintiff is a citizen of the State of Iowa. For the past several years he has been farming a farm owned by him in the vicinity of the City of Cherokee, Cherokee County, Iowa.

The defendant is a corporation organized under the laws of the State of New York. Its principal place of business is at Milwaukee, Wisconsin. It is licensed to do business in the State of Iowa. Among its activities is the manufacture and sale of a structure designed for the storage of farm products to which it has given the name of "Harvestore."

Corn in the field usually has a fairly high moisture content. The amount of such moisture conditions depends upon the growing season and fall weather conditions. The closer corn is contained the greater is the likelihood of spoilage if its moisture content is above certain recognized minimums. If corn in the field has an unusually high moisture content it may spoil even when stored in ear form in the usual type of corn crib. Where the moisture content of newly harvested corn does not exceed 22 per cent it may ordinarily be safely stored in the conventional type of corn crib. Storage of such corn in the conventional type of corn crib for a period

of time will usually result in such a reduction in its moisture content that it may then be shelled and stored in bins or sold in ordinary commercial channels. In order to be stored in shelled form it must have a fairly low moisture content. Ordinarily newly harvested corn will have a moisture content of from 18 to 20 per cent. The higher the moisture content of corn the lower will be its grade. Ordinarily corn having a moisture content in excess of 14 per cent cannot be stored in shelled form without danger of spoiling. Corn having a moisture content of 14 per cent or less is regarded as low moisture content corn. It is possible to reduce the moisture content of corn so as to raise its grade, make it safe for storage, and salable in ordinary commercial channels by means of mechanical drying. Such drying is a matter of some expense. Ordinarily the moisture content of corn at harvest time is such that it cannot be sold in ordinary commercial channels or stored in shelled form in bins. The price of corn in the fall is usually much lower than it is from March on in the following year.

The defendant's structure is designed for the storage of different kinds and types of farm products. It is cylindrical in form and similar in appearance to a silo. It is largely designed to provide hermetic or sealed storage for farm products. The bin is constructed of steel sheets with a fused glass coating bonded to the surface. The bin is erected upon a concrete base and has a concrete floor. The steel sheets lay over each other and are bolted into place. Sealing mastic is applied between the lapped and bolted joints. There are two doors on the top and one on the side near the top which may be opened for filling purposes. There is provision for an opening near the bottom for discharging by means of mechanical equipment. The filling and discharge openings are fitted with gasketed closures so as to maintain sealed conditions. To avoid the danger of collapse or rupture of the bin due to pressure differences from temperature changes, withdrawal from the bin or other causes, a large plastic bag, referred to as the "breather bag," is suspended under the roof. When the pressure inside the bin is reduced, air is drawn into the bag. If the pressure increases, the bag is deflated without exchange of air in contact with the stored product. Large changes in pressure are accommodated by a relief valve which permits gas to escape or air to enter when the pressure difference reaches a predetermined amount. Bins of this type have been marketed since about 1945. They have been marketed by the defendant since 1950. They are designed for the storage of different farm products. Spoilage of corn is primarily due to the flourishing of microorganisms. They tend to flourish in corn which has a fairly high moisture content. They flourish more rapidly when such corn is stored in containers which greatly restrict air circulation. Under suitable conditions the microorganisms respire. In so doing they consume oxygen. Their consumption of oxygen gives off carbon dioxide. Carbon dioxide is heavier than air and if contained it replaces oxygen in the crevices of stored corn and forms a blanket on top of it. When the kernels of corn are entirely surrounded by carbon dioxide they are shut off from oxygen and the microorganisms in the kernels cannot respire and spoilage is arrested.

The defendant's storage bin is designed to make use of that feature in connection with the storage of corn having a sufficiently high moisture content to generate carbon dioxide protection. When one of the doors at the top of the defendant's bin is opened for filling purposes oxygen comes into it from the top and continues to come in until the door is closed. Since carbon dioxide is heavier than air it does not tend to escape upward during the temporary opening of a door at the top and ordinarily the air coming in through the opening does not diffuse the carbon dioxide protection given to the corn already in the bin. After a top door is closed after being opened for filling, carbon dioxide protection builds up for the newly stored corn. Since

carbon dioxide settles to the lower part of the bin it quite readily escapes when an opening is available at or near the bottom. When it so escapes it is replaced by oxygen which starts respiration by the microorganisms and consequent spoilage to the stored corn.

The defendant's bin was also designed for the storage of so-called dry or low moisture content corn, i. e., corn having a moisture content of below 14 per cent. Where the moisture content of corn is below 14 per cent the microorganisms will not respire and no carbon dioxide will be given off. In such cases the stored corn will not have carbon dioxide protection. When so-called dry or low moisture content corn is stored in one of the defendant's bins the bin must be equipped with a recirculating system. The recirculating system consists of a motor operated fan which is designed to move the air downward through the corn and return the air to the top again. The principal purpose of the recirculating system is to prevent the accumulation of outside moisture.

The defendant had a display at the 1953 Iowa State Fair advertising its Harvestore bin. It there came to the attention of the plaintiff. Later he learned that Arthur Linder, a farmer living near Hartley, Iowa, had two of the defendant's bins. He went to the Linder farm to examine the bins. While there he visited with Mr. Linder. Mr. Linder had found that the bins stored high moisture content corn satisfactorily. He also had found that high moisture content corn stored in the bins acquired a sweet smell and sweet taste and was well liked by cattle.

During the summer of 1955 the plaintiff noticed and read a piece of literature advertising the defendant's bin at the place of business of the Cherokee Implement Company in Cherokee. A copy of that piece of literature was introduced into evidence. At the time he was in the place of business of the Cherokee Implement Company he did not discuss the bin. The Cherokee Implement Company is a dealer in farm implements.

Elmer Johnson is one of its salesmen. In July 1955 Howard L. Peterson was in the employ of the defendant as a salesman. He had been in its employ in such capacity since 1950.

In 1955 the plaintiff was about 47 years of age and had been engaged in farming for about five years. The farm owned and operated by him consisted of 460 acres. It contained 320 acres of tillable land and 140 acres of pasture. Prior to engaging in farming he had operated a truck line for about 19 years. Two of the principal activities of the plaintiff in connection with his farming operations have been the raising of corn and the feeding of cattle. Prior to 1953 he normally fed from 200 to 250 head of cattle. In July 1955 he sustained a heart attack. Thereafter he reduced his cattle feeding operations. In the fall of 1955 he was feeding around 75 head of cattle. The principal feeds fed by him to the cattle were silage and corn. In 1955 he had two silos on his farm. He also had several corn cribs for the storage of ear corn. The defendant's bin is suitable for the storage of silage but the plaintiff in 1955 had no need of additional storage space for silage. Following his heart attack the plaintiff installed equipment by means of which silage was augered from the silos into the feed bunks. That equipment saved handling silage by hand.

On July 25th, 1955, Howard L. Peterson, accompanied by Elmer Johnson, called on the plaintiff at his farm for the purpose of selling him one of the defendant's bins. The plaintiff told them he was desirous of having proper storage facilities for high moisture content corn raised by him and purchased by him. He informed them that he wished to use a picker-sheller to harvest the corn raised by him and store the shelled corn. He also informed them that he wished to purchase high moisture content corn in the fall when the price was low and store such corn in shelled form. He also informed them that he wished to feed about half of the stored corn and sell the remaining half in commercial channels the

following year when prices would be higher. He made it known to them that he did not desire facilities in which to store silage or low moisture corn. He made it clear to them that what he desired was facilities which would store high moisture corn in such a manner that it would later be suitable for feeding purposes and sale in commercial channels. The plaintiff testified that Howard L. Peterson assured him that the defendant's bin was adapted for such storage. Howard L. Peterson then discussed with the plaintiff the profits that could accrue to him by the purchase of the bin. They both knew that usually the price of corn was lowest at harvest time. In the piece of literature put out by the defendant heretofore referred to, it was stated that the average price difference between corn at harvest time and at later highs for the period from 1948–1952 was 21 cents a bushel. Howard L. Peterson wrote down figures which purported to show that the profits realized by the sale of the stored corn at later highs over a four year period would equal the purchase price of the bin. The plaintiff told him that he wished to study the figures before making a decision. Howard L. Peterson and Elmer Johnson then proceeded to the farm of Robert Nelson, a neighbor of the plaintiff, for the purpose of interesting him in the purchase of a bin. Howard L. Peterson told Robert Nelson that the plaintiff had purchased one of its bins. Robert Nelson did not become a purchaser.

Howard L. Peterson and Elmer Johnson then returned to the plaintiff's farm. The plaintiff in the meantime had studied the figures prepared by Howard L. Peterson. There was further discussion relating to the bin. The plaintiff testified that Howard L. Peterson told him that if there were any defects in the bin the defendant would see that they were remedied. During the course of the discussion on the day in question there was discussed the matter of the equipment for discharging the products stored in the bin. Products which are stored in structures of the type of the defendant's bin are generally removed by means of an auger extending into the structure at the bottom. The defendant had an auger type of discharge equipment referred to by it as the Harvestore Unloader which was designed to be sold for use in connection with its bin and which would be furnished and installed by it. The plaintiff was concerned about having discharge equipment which would fit into the auger type equipment he was using to auger silage into the feed bunks. Howard L. Peterson informed the plaintiff that it was not obligatory that a purchaser of one of the defendant's bins purchase the defendant's auger equipment or have it installed by it and that if the plaintiff so desired he could furnish and install his own equipment for discharging the stored grain. The plaintiff stated that if he purchased the bin he would furnish and install his own discharge equipment. Howard L. Peterson offered to sell the defendant's Harvestore Unloader for $150. The defendant's bins come in several sizes. During the course of the discussion on that day came up the question of what capacity bin might best suit the purpose of the plaintiff. The plaintiff stated that he normally fed from 4,000 to 5,000 bushels of corn. In order to fit into the plans of the plaintiff to feed about half of the stored corn and sell the other half in commercial channels, a bin having a capacity in the neighborhood of 9,000 bushels would be needed. The figures that Howard L. Peterson furnished to the plaintiff were based on a bin of that capacity. Following the completion of negotiations on the afternoon of that day, the plaintiff signed a purchase order for one of the defendant's bins. On the face of the order there appears the following: "Oct. 1 1955 used for corn." The bin purchased was approximately 20 feet in diameter and approximately 40 feet in height. Its corn capacity was 9,200 bushels. The defendant was to assemble and erect the bin on footings and foundations prepared by the plaintiff under its supervision. The purchase price was $5,750 of which $750.57 was payable with the order and the balance on October 1st, 1955. The plaintiff

76

made the down payment of $750.57 and completed payment of the balance in November 1955. It appears that the pertinent discussion and negotiations which preceded the signing of the purchase order were entirely between the plaintiff and Howard L. Peterson.

The footings and foundations for the bin were put in by the plaintiff under the supervision of Elmer Johnson. They were completed on August 20, 1955. The cost to the plaintiff of the footings and foundations was the sum of $717.30. The bin was then assembled and erected under the supervision of the defendant. The installation was completed on September 21st, 1955. In 1955 Ford Anderson was the area manager for the defendant in the area in which the plaintiff's farm was located. He is frequently referred to in the record as Louie Anderson. Following the construction Ford Anderson gave the bin what is known as the smoke test. In that test the bin is filled with smoke which will manifest any leaks in it. The first smoke test disclosed a small leak. A bolt or bolts were then tightened and the second smoke test showed no leaks. Ford Anderson also tested it for pressure. He then informed the plaintiff that the bin was "o.k." and ready for use.

On September 25, 1955, the plaintiff picked and shelled 1500 bushels of his own corn and put it in the bin. That corn had an estimated moisture content of around 20 per cent. In October and November the plaintiff purchased 5,235 bushels of corn from other parties and put it in the bin. The total amount of corn placed in the bin was 6,735 bushels. The corn purchased by him was in shelled form and had a moisture content of 17 to 18 per cent. He paid from $1.14 to $1.20 a bushel for it. It was purchased by him starting in October and ending on November 12, 1955.

There was an opening near the bottom of the bin to be used for the purpose of removing the stored product from it. At the time the assembled crib was turned over to the plaintiff for use this bottom hold was covered with a heavy,

two-section cast iron plate which was securely bolted into position. That plate permitted no air to enter the bin.

In November 1955 after the plaintiff had stored the 6,735 bushels of corn in the bin he commenced work on the installation of equipment for the removal of corn from it. He wished to use some of it for feeding purposes. The equipment was of his own selection as was the means and manner of its installation. In December 1955 the plaintiff commenced removing corn from the bin for feeding purposes. Up to February 15, 1956, he removed around 1,140 bushels for that purpose. All of it was in good condition. During that period groups who were interested in the type of bin visited the farm. The plaintiff removed corn from the bin for their benefit. The corn so demonstrated was in good condition.

Following February 15, 1956, the corn began to show signs of spoilage and thereafter it manifested progressive spoilage. After about 600 more bushels had been removed the cattle refused to eat it. The plaintiff tried various experiments to make the corn suitable for feeding purposes and without success. The corn remaining in the bin amounting to 2,900 bushels was afterwards sold by the plaintiff. It was in very poor condition and graded only sample grade. The plaintiff received 65 cents a bushel for it. At the time the plaintiff sold that corn the price of No. 2 corn was approximately $1.48 a bushel.

The plaintiff made no use of the bin after he sold the last of the spoiled corn from it. He sought and seeks to recover the purchase price of the bin in the sum of $5,750.57 and the amount expended by him for the foundations and footings of the bin and the damages sustained by him because of the spoilage of the corn in the crib in the approximate sum of $12,900. In his complaint the plaintiff alleged that the total damages sustained by him was in the sum of $19,391.95. In his complaint the plaintiff alleged that 7600 bushels of corn were spoiled and had no value and that the reasonable value of the corn if unspoiled was $1.50

per bushel. The testimony of the plaintiff at the trial was that the total number of bushels in the crib was 6,735.

It was stipulated that on May 8, 1956, the plaintiff made demand upon the defendant for the payment to him of the purchase price of the structure and for the damage to the stored corn, which demand was refused by the defendant on May 22, 1956.

It is the claim of the plaintiff that an implied warranty of fitness for purposes intended arose in connection with the sale. It is the claim of the plaintiff that an express warranty of fitness for purposes intended was made by Howard L. Peterson in connection with the sale.

It is the contention of the defendant that the transaction did not give rise to the claimed implied warranty. It is the contention of the defendant that Howard L. Peterson did not make the claimed express warranty and that if he did he was lacking in authority to so do. There is a limited express warranty in the contract of purchase but the plaintiff makes no claim thereunder. It is the contention of the defendant that the bin was sold under the trade name of "Harvestore" and that therefore there was no implied warranty for any purpose. It is the contention of the defendant that certain provisions in the contract of purchase exclude the claimed implied and express warranties and limit liability based thereon. It is the contention of the defendant that the spoilage of the corn occurred because the plaintiff permitted the carbon dioxide in the bin to escape during the installation of the discharging equipment and permitted the carbon dioxide to leak out because of lack of effective sealing of that equipment.

It is the contention of the plaintiff that the provisions in the contract of purchase upon which the defendant relies in connection with its claim of exclusion were not read by him or made known to him and that they are not binding on him. It is his further contention that if the said provisions are binding on him they do not exclude the implied warranty claimed by him and liability based thereon.

The plaintiff bases his action on both implied warranty and express warranty. It is proper for him to do so. Conkling v. Standard Oil Co., 1908, 138 Iowa 596, 116 N.W. 822. See also Marxen v. Meredith, 1955, 246 Iowa 1173, 69 N.W.2d 399. It is the claim of the plaintiff that if the bin had been so warranted the bin would have arrested any spoilage in 18 to 20 per cent moisture content corn until it was ready to be used for feed or sold in commercial channels. There are two phases to the claimed warranty—one relating to the matter of corn to be fed and the other to the matter of the corn to be sold in commercial channels. In order for corn to be sold in commercial channels it must be in marketable condition. In order to be sold in commercial channels corn must have a low moisture content or be in such condition that it can be reduced to the proper moisture content by mechanical drying without affecting its condition otherwise. It is the claim of the plaintiff that Howard L. Peterson stated to him prior to the sale that high moisture content corn stored in the bin could later be sold in commercial channels. Howard L. Peterson denies that he so stated. It is also the claim of the plaintiff that Howard L. Peterson stated to him prior to the sale that high moisture content corn stored in the bin would be suitable for feeding. The defendant does not contend that Howard L. Peterson did not so state. Arthur Linder, the farmer living near Hartley whom the plaintiff visited prior to purchasing, testified that high moisture content corn stored in the defendant's bins could not be sold in commercial channels but could be fed or sold to other cattle feeders. Ford Anderson, the defendant's area manager, and Howard L. Peterson also so testified. The defendant does not contend otherwise. The plaintiff testified that Howard L. Peterson stated to him prior to the sale that high moisture content corn would suffer 1 or 2 per cent damage by storage in the bin and would acquire a sweet smell. It is

the claim of the defendant that such statement by Howard L. Peterson informed the plaintiff and put him on notice that high moisture content corn stored in the defendant's bins could not be sold in commercial channels. It is clear from the evidence that 18 to 20 per cent moisture content corn stored in one of the defendant's bins will be damaged from 1 per cent to 2 per cent and will acquire a sweet or silage odor. Apparently the respiration of the microorganisms in corn of that moisture content stored in one of the defendant's bins which brings about the carbon dioxide protection results in such fermentation as to give the corn somewhat of a silage character. It is clear that corn having such a character is suitable for feeding purposes or for sale to cattle feeders who wish to buy corn to be currently fed to their cattle. It is also clear that corn having such a character cannot be sold in commercial channels. In the piece of literature put out by the defendant heretofore referred to it emphasizes the profits that could be made by storing corn in its bin for later sale. No reference is made therein to the fact that high moisture content corn could not be stored in the bins for later sale in commercial channels. It is evident that the plaintiff did not understand that high moisture content corn stored in the bin could not later be sold in commercial channels. Apparently it was his understanding that high moisture content corn stored in the bin could be removed later and have its moisture content reduced to the requisite content and sold to elevators for distribution through well recognized commercial channels. The fact that the plaintiff purchased several thousand bushels of corn to store in the bin for later sale in commercial channels lends support to his claim that he so believed at the time of the purchase. The evidence preponderates that Howard L. Peterson did state to the plaintiff prior to the sale that high moisture content corn could be stored in the bin and later sold in commercial channels and that the figures given by him to the plaintiff were based on that assumption.

Because of certain features of this case reference will be made to a number of general rules of law.

 In early common law a breach of implied warranty in the sale of goods was a tort and an action for the recovery of damages for such breach was a tort action. Nelson v. Anderson, 1955, 245 Minn. 445, 72 N.W.2d 861. The action was upon the case for breach of assumed duty and the wrong was conceived to be a form of misrepresentation in the nature of deceit. Prosser, The Implied Warranty of Merchantable Quality, 27 Minn.L. Rev. 117, 118 (1943). See Prosser, Law of Torts (2d Ed.), p. 493 (1955). See also Fire Ass'n of Philadelphia v. Allis Chalmers Mfg. Co., D.C.1955, 129 F. Supp. 335, 361, 362. The separation of warranty from deceit was completed by about the beginning of the Nineteenth Century and by that time warranty became identified with the existence of a contract between the parties. Prosser on Torts (2d Ed.), p. 523 (1955). It is now well settled that an action for breach of warranty is based on contract. In 55 C.J., p. 653, 654, Sales, the modern rule is stated as follows:

"A warranty is contractual in nature. Warranties may be either express or implied, but in either event the relations between the parties arise out of contract and are not based on what is known as tort or on duties imposed by law on any theory unrelated to contract. * * *. * * * a clear distinction has been pointed out between an action for fraud and deceit and consequent damages and an action to recover upon a breach of warranty, in that the warranty rests upon contract, while fraud or fraudulent representations are essentially a tort. The contractual character of a warranty is widely recognized as an essential factor differentiating it from various obligations and remedies founded on tort ·liability. To the existence of

every warranty, two interrelated contracts are necessary, namely, a contract of sale to which the warranty is incidental, and the contract of warranty itself. See also 77 C.J.S. Sales § 302."

In the case of American Fruit Product Co. v. Davenport Vinegar & Pickling Works, 1915, 172 Iowa 683, 154 N.W. 1031, at page 1036, the Iowa Court quotes from Mechem as follows:

"'* * * Warranty must be distinguished from representation. Representation is an antecedent statement which is made to induce the entering into a contract, but which is not a term in or an element of the contract. Its purpose is accomplished when the contract is made. Warranty on the other hand, is by the intention and agreement of the parties a term in, a part of, or an incident to that contract, and cannot exist without it.' 2 Mechem on Sales, §§ 1222, 1224."

The Iowa Court continues (at page 1036 of 154 N.W.):

"It would be difficult to put in words a clearer or more felicitous statement of a distinction over which lawyers and courts have sometimes stumbled. * * *."

Liability on warranty is sometimes referred to as "strict liability." Prosser on Torts (2d Ed.), p. 523 (1955). Good faith and lack of negligence on the part of the vendor are no defense. Prosser on Torts, supra, p. 523. It is well settled that negligence is not involved in an action for breach of warranty. Frank R. Jelleff, Inc., v. Braden, 1956, 98 U.S. App.D.C. 180, 233 F.2d 671, 679. Neither is contributory negligence. Bahlman v. Hudson Motor Car Co., 1939, 290 Mich. 683, 288 N.W. 309. Neither is res ipsa loquitur. 77 C.J.S. Sales § 365, p. 1287. If an affirmation of the seller relating to the article being sold by him is made by him with knowledge of its falsity, it is still a warranty and is also a fraud. Carter v. Abbott, 1871, 33 Iowa 180. In an action for breach of warranty it is not necessary for the buyer to show scienter on the part of the seller or that he knew the warranty was false. Passcuzzi v. Pierce, 1929, 208 Iowa 1389, 227 N.W. 409. A buyer may in the same action plead breach of warranty in one count and fraud and deceit in another count based upon the same statements of the seller. See Joy v. Bitzer, 1889, 77 Iowa 73, 41 N.W. 575, 3 L.R.A. 184. However, a buyer having asserted a demand based on breach of contract right and having tried his case on that theory may not later mend his hold and claim relief based on the theory of tort. Conkling v. Standard Oil Co., 1908, 138 Iowa 596, 116 N.W. 822. The question as to whether a buyer's action is based on contract for breach of warranty or on tort for fraud is frequently of importance in sales litigation. It is sometimes of importance in connection with the matter of damages and in connection with the acts of the seller's agent in connection with a sale.

In the present case jurisdiction is based upon diversity of citizenship. The parties are not in controversy as to the applicable law. It seems clear that the Iowa law is the applicable law.

Iowa adopted the Uniform Sales Act in 1919. Chapter 396, Acts of Thirty-Eighth General Assembly. It appears as Chapter 554, Code of Iowa 1954, I.C.A. Section 554.16 contained in that Chapter provides, in part, as follows:

"Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

The Iowa Supreme Court prior to the adoption of the Uniform Sales Act applied the same rule under common law. Parsons Band-Cutter & Self-Feeder Co. v. Mallinger, 1904, 122 Iowa 703, 98 N.W. 580. (Band cutter and self feeder); B. F. Sturtevant Co. v. Le Mars Gas Co., 1920, 188 Iowa 584, 176 N.W. 338. (case arose in 1915—blower for gas plant); Blackmore v. Fairbanks, Morse & Co., 1890, 79 Iowa 282, 44 N.W. 548. (engine and boiler); See also Davenport Ladder Co. v. Edward Hines Lumber Co., 8 Cir., 1930, 43 F.2d 63. Since the adoption of the Act there have been quite a large number of cases in which the Iowa Supreme Court has sustained a recovery by a buyer for a breach of implied warranty of fitness. Among such cases are: Hughes v. National Equipment Corporation, 1933, 216 Iowa 1000, 250 N.W. 154 (grading equipment); Brandenberg v. Samuel Stores, 1931, 211 Iowa 1321, 235 N.W. 741, 77 A.L.R. 1161 (fur coat); Trousdale v. Burkhardt, 1929, 207 Iowa 1133, 224 N.W. 93 (cow for breeding purposes); Drager v. Carlson Hybrid Corn Co., 1952, 244 Iowa 78, 56 N.W.2d 18. (seed corn). In the latter case the Court stated (at page 21 of 56 N.W.2d) that the tendency was to narrow the application of the rule of caveat emptor and to expand the doctrine of implied warranty. In the same case the Court stated (at page 21 of 56 N.W. 2d) that an implied warranty of fitness for purpose was more frequently upheld where the seller was a manufacturer. For a discussion as to the probable effect on the Iowa law relating to warranties if the General Assembly of Iowa were to adopt the Uniform Commercial Code, see Wayne C. Collins, Warranties of Sale Under the Uniform Commercial Code, 42 Iowa L.Rev. 63 (1956).

Section 554.13, Code of Iowa 1954, I.C.A., of the Iowa Act provides as follows:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."

Subsection 4 of Section 554.16, Code of 1954, I.C.A., of the Iowa Act provides as follows:

"In the case of a contract to sell or a sale of a specified article under its patent or other trade name there is no implied warranty as to its fitness for any particular purpose."

It is asserted by the defendant that the sale in question came within the purview of the subsection just set out; that such being the case any and all implied warranties were excluded and the Court does not reach the other questions related to or connected with the claimed warranty of fitness.

The defendant does not claim that the bin was sold under a patent name. It does claim that it was sold under the trade name of "Harvestore."

The subject of implied warranties in the case of the sale of goods under a patent or trade name or other particular description has been extensively annotated. 59 A.L.R. 1180, 90 A.L.R. 410, and 135 A.L.R. 1393. That subject has been considered by the Iowa Supreme Court in a number of cases since the adoption of the Iowa Act. Marxen v. Meredith, 1953, 246 Iowa 1173, 69 N.W. 2d 399; Hughes v. National Equipment Corporation, 1933, 216 Iowa 1000, 250 N.W. 154; Miller v. Economy Hog & Cattle Powder Co., 1940, 228 Iowa 626, 293 N.W. 4; Rowe Mfg. Co. v. Curtis-Straub Co., 1937, 223 Iowa 858, 273 N.W. 895. Prior to the adoption of the Iowa Act the Iowa Supreme Court recognized the rule that when a specified described article is ordered of a manufacturer there is no implied warranty that it will perform the service intended or desired by the purchaser. George E. Pew Co. v. Karley & Titsenor, 1914, 168 Iowa 170, 150 N.W. 12; American Player Piano Co. v. American Pneumatic A. Co.,

1915, 172 Iowa 139, 154 N.W. 389. In the case of Davenport Ladder Co. v. Edward Hines Lumber Co., 8 Cir., 1930, 43 F.2d 63, the Circuit Court of Appeals for this Circuit, in deciding a case under the Iowa law after the adoption of the Iowa Act, held that the sale of lumber designated as "Norway Pine" did not exclude an implied warranty of fitness. In its opinion in that case the Court observed (43 F.2d at page 67) that the provision of the Uniform Sales Act in question was not exactly the same as the common law rule in that under the Act a dealer was placed under the same responsibility as a manufacturer and the Act used the term "trade name" rather than the term "specified, described article."

In each of the Iowa cases cited in this connection which had to do with the provision of the Iowa Act in question it was held that an implied warranty of fitness of purpose was not excluded thereunder. The case of Marxen v. Meredith, supra, involved the sale of a hog spray. In that case the Court stated (at page 402 of 69 N.W.2d):

"Appellants contend no warranty can here be implied because the spray was sold under its trade name. However, there was substantial evidence plaintiff did not purchase this spray by name, but for a particular purpose made known to appellants and that he did not rely upon the trade name but upon appellants' judgment in furnishing him the spray for that purpose. * * * "

In the case of Hughes v. National Equipment Corporation, supra, the Court stated as follows (at page 157 of 250 N.W.):

" * * * As stated in 55 C.J. p. 757: 'The fact that an article has a trade name does not negative the existence of an implied warranty of fitness for a particular purpose when it is purchased, not by name, but for a particular purpose and supplied for that purpose; and where the buyer relies not upon the trade-mark but upon the seller's judgment, there is

an implied warranty of fitness for a particular purpose.' "

■ In the present case, as heretofore noted, the defendant had given the bin the name of "Harvestore." There is no substantial evidence that the plaintiff purchased the bin by name or that he relied on the name in so doing. It is the holding of the Court that the sale in question did not come within the purview of the so-called "trade name" section of the Iowa Act and that the existence of an implied warranty of fitness was not excluded by that provision.

The evidence preponderates that the plaintiff did make known to Howard L. Peterson the particular purposes for which he proposed to use the bin. The pertinent provision of the Iowa Act contains the requirement that the buyer rely upon the seller's skill or judgment. In connection with the matter of reliance, the defendant places some stress on the fact that the plaintiff prior to the sale had inspected and made his own investigation as to the bins on the Arthur Linder farm. In the case of Drager v. Carlson Hybrid Corn Co., supra, the Iowa Supreme Court states (at page 22 of 56 N.W.2d):

"It is not necessary that the buyer testify in so many words he relied on the seller's skill or judgment. Reliance may be shown by the circumstances of the case. The buyer's reliance on the seller need not be a total reliance. The buyer may rely on his own judgment as to some matters and on the seller's skill and judgment as to others. * * *."

The defendant also argues that his investigation of the bins in operation on the Arthur Linder farm did or should have made known to the plaintiff that high moisture content corn stored in the defendant's bins could not be sold in commercial channels. The evidence preponderates that the plaintiff did not so know. The evidence preponderates that the plaintiff did rely upon the skill or judgment of Howard L. Peterson in connection with the sale. Therefore, apart

from other features in the case, the circumstances surrounding the sale and the statements of Howard L. Peterson would have given rise to both the implied and express warranties claimed by the plaintiff.

It is the contention of the defendant that even if the implied warranty sought to be asserted by the plaintiff is not excluded by the so-called "trade name" provision of the Iowa Act neither the implied warranty nor the express warranty asserted by the plaintiff are of avail to him because of certain provisions in the purchase order. A preliminary matter should be noted. A selling agent has implied power to warrant the goods sold by him whenever an equivalent warranty would be implied by the law. 2 C.J.S. Agency § 115, p. 1334. Accord: Conkling v. Standard Oil Co., 1908, 138 Iowa 596, 116 N.W. 822. In that case the Iowa Supreme Court stated in substance (at page 826 of 116 N.W.) that where the express warranty is the equivalent of the warranty of fitness for purpose implied by the law the question of the authority to make the express warranty is non sequitur. See W. H. Hoopes & Sons v. F. H. Simpson Fruit Co., 1917, 180 Iowa 833, 161 N.W. 629, 631. In that case the Iowa Supreme Court observed (at page 631 of 161 N.W.):

" * * * Some confusion is found in the argument in the use of terms. It is suggested that an express warranty necessarily means a written one. Of course, this is not true. An express contract of any kind may be either oral or in writing. An implied one is never in writing, but grows out of the nature of the transaction."

On the question of whether an oral warranty of a chattel is within the Statute of Frauds, see annotation 40 A.L.R.2d 760. The subject of the authority of an agent selling personal property to make warranties has been extensively annotated 40 A.L.R.2d 285. See also Ferson, Agency To Make Warranties, 50 Vand.L.Rev. 1 (1951). The knowledge of an agent as to the purpose of the buyer in connection with the use of the item which is the subject matter of the sale is imputed to his principal. Hughes v. National Equipment Corp., 1933, 216 Iowa 1000, 250 N.W. 154, 157.

In the present case the express warranty asserted by the plaintiff is the same as the implied warranty asserted by him. The situation in the present case, as heretofore noted, is that apart from other considerations there would have run to the plaintiff an implied warranty for the purposes referred to. Those other considerations relate to the provisions contained in the purchase order. In the briefs and arguments filed by the parties their arguments on this phase of the case relate to the validity and effect of those provisions as to the asserted implied warranty and liability thereunder. The pertinent provisions of the purchase order are next set forth.

"6. (a). The only warranty made by the seller with respect to the products furnished under this order (except the warranty in 6 (b).) is to supply an identical or substantially similar replacement part f. o. b. the seller's factory (notwithstanding seller may from time to time hereafter modify any part or change the design and operation thereof) or at the option of the seller to repair on the site or allow credit for such part as may prove defective within a period of one year, provided such products are in the hands of the original purchaser and have been properly used and operated for the purpose for which sold. The period of warranty of the Harvestore Structure shall be computed from the date of completion of field installation, and the period of warranty of the Harvestore Unloader and/or accessories shall be computed from the date of installation. Subject to the foregoing conditions, the seller also will replace, repair or allow credit for any replacement or repair part which may prove defective within sixty days

after the date of replacement or repair.

"6. (b). The seller or its authorized representative will furnish without charge the labor or mileage required for any warranty replacement or repair made within the initial forty-five days of the one-year warranty on, respectively, the Harvestore Structure, the Harvestore Unloader and/or accessories.

"6. (c). The seller shall not be subject to any other or further liability and no claims for labor (except as provided in 6 (b).) or for consequential damages will be allowed. The buyer indemnifies and protects the seller against all loss or damage to persons or property (other than the cost of or credit for replacement or repair as aforesaid) resulting from or arising out of or in connection with the field assembly, use or operation of the products. The seller shall be notified promptly of any part claimed to be defective within the warranty period; and such part shall be held subject to inspection by the seller.

"11. This order form is the entire and only agreement between the seller and buyer; and no oral statements or agreements not confirmed herein, or by a subsequent written agreement, shall be binding on either the seller or buyer."

The contentions of the plaintiff in connection with those provisions are set out in the written brief and argument filed in his behalf. In that brief it is stated:

"The printed provisions on the back of the order form signed by plaintiff does not limit or nullify the warranty implied by law under Section 554.16, subsection 1, of the 1954 Code of Iowa [I.C.A.]."

In that brief it is also stated: "Plaintiff was not aware of any provisions on the back of the form."

The plaintiff does not claim fraud or deceit on the part of Howard L. Peterson or the defendant. His claim, as heretofore noted, is based upon breach of contract. If the plaintiff had alleged and established fraud or deceit on the part of the defendant, the provisions in the purchase order would not avail it. The Iowa Supreme Court has so held in numerous cases. In the case James v. Grill, 1919, 186 Iowa 1300, 1306, 173 N.W. 897, 899, that Court succinctly stated "Fraud vitiates all contracts." See also Hall v. Crow, 1948, 240 Iowa 81, 34 N.W.2d 195, and cases cited. See two Comments on this case, 35 Iowa L. Rev. 105 and 107 (1949). In the first Comment it is stated (p. 107) that under the Iowa law a seller is rendered powerless to protect himself against false representations of his agent. Since neither fraud nor deceit nor related tort liability is involved, the contentions of the parties have to be determined in accord with the pertinent provisions of the Iowa Uniform Sales Act and the pertinent decisions of the Iowa Supreme Court relating to contracts.

Subsection 6 of Section 554.16, Code of Iowa 1954, I.C.A. of the Iowa Act provides as follows:

"An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith."

Section 554.72, Code of Iowa 1954, I.C.A., of the Iowa Act provides as follows:

"Where any right, duty, or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale."

The Uniform Sales Act has to a large extent pre-empted the field as to warranties in connection with the sale of goods. There are matters related to sales that the Act does not purport to pre-empt. Section 554.74, Code of 1954, I.C.A., of the Iowa Act provides as follows:

"In any case not provided for in this chapter the rules of law and

equity, including the law merchant, and in particular the rules relating to the law of principal and agent and to the effect of fraud, misrepresentation, duress or coercion, mistake, bankruptcy, or other invalidating cause, shall continue to apply to contracts to sell and to sales of goods."

This section leaves the local law in effect as to many phases of sales. H. C. Horack, The Uniform Sales Act, 3 Iowa Law Bulletin 67, 122 (1917).

It is the claim of the plaintiff that the Court does not reach the question as to whether the provisions of the purchase order negative or vary the asserted implied warranty of fitness or relieve the defendant from liability in connection with a claimed breach of that warranty because he was not aware of those provisions of the purchase order until after the corn in the bin showed signs of spoilage. That claim of the plaintiff will be next considered. As heretofore noted, the purchase order forms supplied by the defendant were contained in a pad. They were in quadruplicate consisting of a white copy, a yellow copy, a blue copy, and a pink copy with intervening sheets of carbon paper. The sheets were 11 inches in length and 8½ inches in width with printing on the front and the back. On the face of the order there were numerous blank spaces which were to be filled in in connection with a sale. Under a column headed "Description of Product" the following printed words appear:

"Harvestore Structure
Harvestore Unloader"

Opposite each of those items there was a space entitled "Price" in which the price of each could be inserted. At the top of the face of the order the following printed words appear:

"Order Form
Harvestore Division

A. O. Smith Corporation
Milwaukee 1, Wisconsin"

In the lower left-hand corner of the face of the order appears the following:

"The receipt of a *check* in the amount of *$750.57* is hereby acknowledged and said amount will be refunded to the buyer promptly in the event this order is not accepted.

Cherokee Impl
———————————
Name of Dealer or
Sales Representative
H. L. P."

The italicized words were written in by a ball point pen. The balance of the words were in printing. The check referred to was submitted with the order. At the bottom of the face of the order immediately above the signature of the plaintiff appears the following printed provision:

"The undersigned buyer hereby places his order with the seller, A. O. Smith Corporation, for the above products manufactured by the seller, subject to acceptance of this order by the seller at the above address and subject also to the terms and conditions of sale set out on the reverse side of this form."

The provision was two lines in length and was immediately below a blank space provided for filling in the location of the bin. That space contained the location of the plaintiff's farm. The bottom line with the words "subject also to the terms and conditions of sale set out on the reverse side of this form" was about ¼th of an inch above the top part of the plaintiff's signature. On the reverse side of the order form at the top thereof there appear the words "Terms and Conditions of Sale." Those words are in large print. Under those words are printed provisions numbered 1 through 12. Those provisions are in medium-sized print. Such of the provisions as are here pertinent have heretofore been set out. The plaintiff signed his name on the white copy with a ball point pen. The sheets of carbon paper intervening between the order form sheets caused his signature

to be impressed on them. Following the affixing of the plaintiff's signature to the order form Howard L. Peterson retained the white and yellow copies. He delivered the pink copy to the plaintiff and the blue copy to the Cherokee Implement Company. The copies retained by Howard L. Peterson, together with the plaintiff's tendered check in the sum of $750.57, were submitted to the defendant for its acceptance or rejection. The white copy bears several rubber stamp marks. Those marks show that the order was processed by the defendant's purchasing department, its credit department, and by its distribution service department. The stamp marks show that the latter department was located at Kankakee, Illinois. No specific, formal acceptance appears on the order. However, the defendant accepted the down payment and delivered and installed the structure in accord with the provisions of the order. Therefore, it is clear that the defendant did accept the order placed with it by the plaintiff.

The "Terms And Conditions Of Sale" occupy all the reverse side of the order, except for a one inch margin at the top and bottom and a 1½ inch margin at the side. The plaintiff testified that upon being given his copy of the order he folded it and put it in his pocket without noticing or reading the "Terms And Conditions Of Sale." The plaintiff testified and his copy of the order shows that it had been folded to the front. When so folded the "Terms And Conditions Of Sale" are quite prominent. The plaintiff apparently did not notice them. However, a more serious aspect of the situation relates to the matter of the plaintiff apparently choosing not to read what was on the front of the order about ¼th of an inch above the top part of his signature. The plaintiff does not claim that any member of any of the defendant's departments who processed the order for acceptance knew that he had not read the reference to the terms and conditions of sale which appeared above his signature.

It is the well settled rule in Iowa that absent fraud or deception a party to a contract cannot be heard to say that he did not read the contract or did not know its contents. Martin v. Stewart Motor Sales, 1955, 247 Iowa 204, 73 N.W.2d 1, 4; Griffiths v. Brooks, 1940, 227 Iowa 966, 289 N.W. 715; Charlson v. Farmers' State Bank, 1926, 201 Iowa 120, 206 N.W. 812; First National Bank of Sioux Center v. Ten Napel, 1924, 198 Iowa 816, 200 N.W. 405; Midland Mortgage Co. v. Rice, 1924, 197 Iowa 711, 198 N.W. 24; Bank of Holmes v. Thompson, 1922, 192 Iowa 1032, 185 N.W. 986; Shores-Mueller Co. v. Lonning, 1913, 159 Iowa 95, 140 N.W. 197; Zaharyas v. Chicago, R. I. & P. Ry. Co., 1914, 164 Iowa 71, 145 N.W. 294; Blossi v. Chicago & N. W. Ry. Co., 1909, 144 Iowa 697, 123 N.W. 360, 26 L.R.A.,N.S., 255; Holmes v. Baker, 1905, 129 Iowa 49, 105 N.W. 349. The absence of glasses necessary for reading will not excuse the failure to read. Griffiths v. Brooks, supra. Absent fraud or deceit a person who signs a document without reading it or having it read to him is guilty of gross negligence. Charlson v. Farmers' State Bank, supra. Illiteracy or inability to read will not in the absence of fraud relieve a person from a contract signed in ignorance of its contents. First National Bank of Sioux Center v. Ten Napel, supra. In the case of Midland Mortgage Co. v. Rice, supra, the Iowa Supreme Court (at page 27 of 198 N.W.) stated:

> " * * * One who assumes the obligations of a written contract cannot shut his eyes and refuse to inform himself as to its contents, when it lies open and plain before him, and then invoke the aid of a court of equity to have that undone which ordinary care and vigilance on his part would have prevented. To do so would be to trifle with contracts and to destroy their value whenever they proved unsatisfactory."

86

In the case of Shores-Mueller v. Lonning, supra, the Iowa Supreme Court stated (at page 199 of 140 N.W.):

"As a general rule, one should never sign an instrument without reading it, and, if he cannot read, he should have it read to him, and in the absence of fraud or misrepresentation, if he does not read or have it read, the law will presume that he did his duty, or, in other words, will not permit him to say that he did not read, and that it contains something different from what he supposed it did. * * *."

In the same case the Iowa Supreme Court further stated (at page 199 of 140 N.W.):

"As a rule, if a party is able to read and has a chance to do so, but omits this precaution because of his adversaries' statements, as to the contents of the instrument, his negligence will estop him from claiming that the instrument is not binding. * * *."

The Iowa Supreme Court then went on to state (at page 199 of 140 N.W.) that it recognized this latter rule was not in accord with many cases in other jurisdictions. In the case of Blossi v. Chicago & N. W. Ry. Co., supra, 123 N.W. at page 366, the Court quotes with approval the following quotation from a decision by the Circuit Court of Appeals for the Eighth Circuit in which the opinion was written by Judge Walter H. Sanborn:

" 'A written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs and delivers it. * * * If one can read his contract, his failure to do so is such gross negligence that it will estop him from denying it, unless he has been dissuaded from reading it by some trick or artifice practiced by the opposite party. If he cannot read it, it is as much his duty to procure some reliable person to read and explain it to him before he signs it as it would be to read it before he signed it if he were able to do so; and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents.' "

Where a party is able to read a contract and does not do so and no device or subterfuge on the part of the other party prevented him from doing so, he is not relieved from liability because he relied on the other party's construction of the contract. Holmes v. Baker, supra.

 In the present case it appears that the plaintiff was literate and that there was no other obstacle in the way of his reading the purchase order if he had desired to do so, and, as heretofore noted, his failure to read the order was not occasioned by fraud or subterfuge. It is clear from the Iowa cases cited that the failure of the plaintiff to read the purchase order did not render nugatory the provisions of the purchase order relating to the terms and conditions of the sale.

In the present case there is present one feature to which some importance is sometimes attached. The purchase order in question was tendered to the buyer by an agent. It was submitted to the principal for acceptance with a statement over the signature of the buyer that it was being submitted for acceptance in accord with the terms and conditions contained therein.

It is the claim of the plaintiff that even if the provisions in question are not rendered nugatory by his failure to read them nevertheless those provisions do not negative the implied warranty of fitness asserted by him or liability of the defendant to him for the claimed breaches of the same. As to whether those provisions do or do not negative the asserted implied warranty of fitness or liability for claimed breaches of the same is one of the major storm centers of this litigation.

Subsection 6 of Section 554.16, Code of Iowa 1954, I.C.A., of the Iowa Act provides as follows:

"An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith."

Section 554.72, Code of Iowa 1954, I.C.A., of the Iowa Act provides as follows:

"Where any right, duty, or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale."

The Uniform Sales Act does not purport to deal with the construction or interpretation of the provisions in a contract of sale which relate or are claimed to relate to the negativing of implied warranties or which are claimed to have the effect of relieving the seller from certain liabilities in connection with the sale. The provision of the Act, just referred to, provides in substance that a seller may by apt language negative a warranty implied by the Act and may negative or vary other liability on his part in connection with the sale. Neither of the provisions just referred to nor any other provisions of the Act purport to prescribe what language is sufficient for those purposes.

The nature and purpose of an implied warranty under the Uniform Sales Act is well stated in Bekkevold v. Potts, 1927, 173 Minn. 87, 216 N.W. 790, 791, 50 A.L.R. 1164, 1166:

"* * * It is a child of the law. It, because of the acts of the parties, is imposed by the law. * * * The law annexes it to the contract. It writes it, by implication, into the contract which the parties have made. Its origin and use are to promote high standards in business and to discourage sharp dealings. * * *."

The Iowa Supreme Court has observed that the sale of a grist mill that will not grind, of a reaper that will not reap, and of a furnace that heats nothing but the owner's temper leaves much to be desired in the way of a business transaction. Ideal Heating Co. v. Kramer, 1905, 127 Iowa 137, 102 N.W. 840, 841.

The courts have always held that it was not within their province to write or rewrite the provisions of a contract and that parties are free to make their own contractual arrangements. They have also always held that the provisions of a validly consummated contract will be enforced according to their terms, save such provisions as are invalidated by statute or by well recognized rules of law. In the case of Minneapolis Threshing Machine Co. v. Hocking, 1926, 54 N.D. 559, 209 N.W. 996, at page 1000, the Court succinctly states:

"* * * The Uniform Sales Act is not intended to be a restriction upon the rights of parties to contract. * * * It does not contract for the parties; it measures their rights under the contracts they themselves make. It does not purport to create a mold in which all such contracts must be cast. There is nothing contained within its provisions which can be said to prohibit the inclusion of any lawful term that the parties may desire in a contract for sale * * *."

Under the Uniform Sales Act and under the common law a seller of goods has the right to determine the nature and extent of the warranties, if any, he is willing to give to the buyer thereof and what other responsibilities he is willing to assume in connection with the sale. Because of certain practical phases, this almost unlimited freedom on the part of a seller has given rise to many serious and difficult problems. In numerous instances contracts of sale or purchase orders are prepared and provided by the seller. They are in printed form. Such forms frequently contain many provisions relating to what warranties and responsibilities, if any, are as-

sumed by him in connection with the sale and specifying what responsibilities and liabilities he does or does not assume in connection with the sale to all of which a buyer becomes bound by affixing his signature to the form tendered to him. While such contracts are not technically contracts of adhesion, yet in substance and in reality they are such. Insurance policies are illustrative of contracts of that type.

The cases indicate that in many instances the buyers to whom such a form is tendered sign the same after only a cursory reading of the printed provisions contained therein or without reading them at all. The cases indicate that such practice is not uncommon in the case of insurance policies. In sales where the circumstances are such that normally an implied warranty of fitness would be implied but where such warranty is negatived or excluded by the printed provisions in the form signed by the buyer, and it develops that the item purchased is not fit for the buyer's purpose, some troublesome situations arise. In such cases the buyer who had paid the full purchase price for a lister or reaper, or furnace could end up with a lister that did not list, a reaper that did not reap, or a furnace that heated only his own temper, without recourse on the seller. See e. g., Tharp v. Allis-Chalmers, 1938, 42 N.M. 443, 81 P.2d 703, 117 A.L.R. 1344. On the other hand, to impose upon the seller liabilities and responsibilities that he disclaimed in a contract consummated legally and without fraud and deceit on his part would do violence to well recognized and fundamental rules of law relating to contracts.

In the case of insurance contracts the problems involved have been dealt with by the enactment of statutes regulating policy provisions. In one state at least, North Dakota, the Legislature enacted an Act which provides that as to certain types of farm machinery the purchaser may have a reasonable time to ascertain whether the machinery is reasonably fit for the purpose intended and may rescind the sale if it is not and that any provision in the contract of sale to the contrary is void. For a discussion of the North Dakota Act, see Palaniuk v. Allis-Chalmers Mfg. Co., 1928, 57 N.D. 199, 220 N.W. 638.

■■■ In some of the situations involving warranties the situation can be troublesome because of the parol evidence rule. Where an oral express warranty is claimed different from that contained in the written provisions of the contract, or it is claimed that there were oral agreements otherwise varying the written provisions, the parol evidence rule becomes of importance. The situation is further complicated if the claimed oral arrangements were made with an agent. In Iowa the parol evidence rule is one of substantive law rather than of evidence. Martin v. Stewart Motor Sales, 1955, 247 Iowa 204, 73 N.W.2d 1, 4. In the case of Fudge v. Kelley, 1915, 171 Iowa 422, 152 N.W. 39, there was involved a written contract of sale which contained no warranties. The buyer introduced evidence of a contemporaneous oral warranty. The Iowa Supreme Court held that the evidence was admissible. It stated (at page 39 of 152 N.W.):

"* * * This is on the theory that, the contract resting partly in writing and partly in parol, the latter, being in no wise inconsistent with former, might be shown. * * *"

See also J. L. Owens Co. v. Leland Farmers' Elevator Co., 1921, 192 Iowa 771, 185 N.W. 590, 592. Although the parol evidence rule precludes the introduction of parol evidence to vary or add to the terms of an integrated written instrument, the courts allow an implied warranty of fitness to be established by the introduction of testimony to show knowledge on the part of the seller of the particular purpose for which the buyer made the purchase. See Hamman v. Advance-Rumely Thresher Co., 1931, 61 N.D. 505, 238 N.W. 700, 702; Bekkevold v. Potts, 1927, 173 Minn. 87, 216 N.W. 790, 59 A.L.R. 1164. If, however, an implied warranty of fitness is excluded by the language of the contract, then parol evidence tending to show that the seller knew the particular purpose for which

the item is purchased and that the buyer relied upon the seller's skill or judgment is not admissible. Bekkevold v. Potts, supra. The end result of an attempted application of the parol evidence rules just referred to is to come back to a construction and interpretation of the provisions in a contract of sale to ascertain if they excluded the claimed implied warranty of fitness or other claimed warranties.

■ It is well settled that a provision in a contract of sale whereby the buyer waives all implied warranties is valid. See Tharp v. Allis-Chalmers Mfg. Co., 1938, 42 N.M. 443, 81 P.2d 703, 117 A.L.R. 1344, and cases cited in annotation, p. 1350. The subject of the exclusion of implied warranty by express warranty has been extensively annotated. 16 A.L.R. 865. See also Comment, 32 Iowa L.Rev. 784 (1947).

It is evident that the courts have manifested a tendency to attempt to extricate a buyer from a situation fraught with serious consequences to him because of provisions in a sales contract purporting to relieve the seller from responsibility and liability in connection with the subject matter of the sale. In many cases the provisions have been drafted and prepared by the seller and the courts in such cases have applied the rule of strict construction because of that situation. In some cases the language of such provisions is so broad and apt that even the strictest construction of it would hardly seem to be of avail to the buyer. One of the leading authorities in the field of torts is of the view that some courts when faced with a provision in a contract of sale couched in such language resort to "subterfuge" and "evasion" in order to circumvent it. Prosser, The Implied Warranty of Merchantable Quality, 27 Minn.L.Rev. 117, 162 (1943).

In the present case the provisions in the contract of sale relied upon by the defendant are quite broad. The defendant asserts that they go much beyond the mere negation of the asserted implied warranty of fitness. It is the claim of the defendant that in those provisions it has defined, specified, and limited the only warranty assumed by it. It is the further claim of the defendant that in those provisions it is exonerated from any liability beyond that arising from its express warranty. It is the further claim of the defendant that on those provisions it is exonerated from any liability for consequential damages and that a substantial part of the damages claimed by the plaintiff are of that character.

■ In the present case the contract of sale contains the following provision:

"11. This order form is the entire and only agreement between the seller and buyer; and no oral statements or agreements not confirmed herein, or by a subsequent written agreement, shall be binding on either the seller or buyer."

Provisions in a contract or sale to the effect that only the conditions incorporated therein shall be binding have been the subject of several annotations. 75 A.L.R. 1032; supplemental annotations 127 A.L.R. 132 and 133 A.L.R. 136. The question as to whether a provision such as the provision above set out, or substantially similar, will exclude an implied warranty is one on which the courts are in conflict. See annotations above cited.

In cases which involved provisions substantially similar to the provision in question, the Iowa Supreme Court held that such a provision did not have the effect of excluding an implied warranty of fitness. Rowe Mfg. Co. v. Curtis-Straub Co., 1937, 223 Iowa 858, 273 N.W. 895; Hughes v. National Equipment Corp., 1933, 216 Iowa 1000, 250 N.W. 154; Ideal Heating Co. v. Kramer, 1905, 127 Iowa 137, 102 N.W. 840. In the case of Rowe Mfg. Co. v. Curtis-Straub Co., supra, the contract of sale contained no express warranties. It did contain a provision providing that "no conditions, agreements or stipulations, verbal or otherwise, save those mentioned above, shall be recognized." It was held that this provision did not exclude an implied warranty of fitness for purpose. In the case of Hughes v. National Equipment Corp., supra, the situation was that the

**90**

contract of sale apparently did not contain any express warranties but it did contain a provision stating that it contained the entire agreement of the parties. It was held that the provision did not exclude an implied warranty of fitness for purpose. In the case of Ideal Heating Co. v. Kramer, supra, the contract of sale involved contained a clause that when signed "shall fully express the agreement between the parties hereto." It was held that this clause did not exclude an implied warranty of fitness for purpose. In that case the Iowa Supreme Court stated (at page 842 of 102 N.W.):

> "The clause of the contract which provides that the writing, when signed, 'shall fully express the agreement between the parties hereto,' is nothing more than a paraphrase of the long-settled rule of law that the writing is presumed to contain the entire agreement, and parol evidence is not admissible to vary its terms. It does not exclude an implied warranty where one would otherwise be found."

It seems clear that paragraph 11 of the contract in question standing alone would not under the Iowa law exclude the asserted implied warranty of fitness for purpose. It is to be noted in this connection that the Iowa Supreme Court follows a rule which is more favorable to the buyer than do many courts. See A.L.R. annotations last cited.

██ Paragraphs 6(a), (b), and (c) provide, in part, for the replacing of defective parts by the defendant. An agreement on the part of the seller to replace defective parts does not exclude an implied warranty of fitness for purpose. Ideal Heating Co. v. Kramer, supra. Timken Carriage Co. v. C. S. Smith & Co., 1904, 123 Iowa 554, 99 N.W. 183. Neither does a provision that all work is to be done "in a good and workmanlike manner." Ideal Heating Co. v. Kramer, supra.

The Iowa cases heretofore discussed had to do with situations in which the provision in question was not designated as a warranty in the contract of sale but

was regarded as containing one of the conditions of the sale. It is to be noted that the highly artificial distinction made by the English Courts between a "warranty" and a "condition" has been largely abolished by the Uniform Sales Act. Section 554.12, Code of Iowa 1954, I.C.A., of the Iowa Act provides as follows:

> "1. Where the obligation of either party to a contract to sell or a sale is subject to any condition which is not performed, such party may refuse to proceed with the contract or sale or he may waive performance of the condition. If the other party has promised that the condition should happen or be performed, such first mentioned party may also treat the nonperformance of the condition as a breach of warranty."

Under Subsection 6 of Section 554.16, Code of Iowa 1954, I.C.A., of the Iowa Uniform Sales Act, heretofore set out, it is provided that an express warranty does not negative an "implied warranty" unless inconsistent therewith. The law of Iowa prior to the adoption of the Act was in accord with this provision. Loxtercamp v. Lininger Implement Co., 1910, 147 Iowa 29, 125 N.W. 830, 33 L.R.A.,N.S., 501. See, however, Wise v. Central Iowa Motors Co., 1929, 207 Iowa 939, 223 N.W. 862, 864. In the present case there was an express warranty contract in the contract of sale. Where such is the case the question arises whether the language used in connection therewith is broad enough and apt enough to negative an asserted implied warranty. The Iowa Supreme Court has considered that question in a number of cases. In the early case of Blackmore v. Fairbanks, Morse & Co., 1890, 79 Iowa 282, 44 N.W. 548, it was held that an express warranty in the contract of sale of an engine that the "outfit was in good order" did not exclude an implied warranty of fitness for purpose.

In the case of Alpha Checkrower Co. v. Bradley, 1898, 105 Iowa 537, 75 N.W. 369, there was involved the sale of a corncutter. The contract contained a provision referred to as an express warranty

which provided that the property should be in good order. It was held that the provision did not exclude the asserted implied warranty of fitness for purpose. In the case of George E. Pew Co. v. Karley & Titensor, 1912, 154 Iowa 559, 134 N.W. 529, it was held that an express warranty in the contract of sale of an engine that it was of good material and efficient as a piece of machinery did not exclude an implied warranty of fitness for purpose. In the case of Wise v. Central Iowa Motors Co., 1929, 207 Iowa 939, 223 N.W. 862, there was involved the sale of a motor vehicle. The contract of sale contained an express warranty that the vehicle was free from defects in material and workmanship and provided that the seller would replace parts found to be unsatisfactory. It was held the asserted implied warranty of fitness for purpose was not excluded by that warranty. In the case of Petersen v. Dreher, 1923, 196 Iowa 178, 194 N.W. 53, it was held that an express warranty in the contract of sale of a sow that the sow was with pig did not exclude an implied warranty of fitness for breeding purposes. In the case of J. L. Owens Co. v. Leland Farmers' Elevator Co., 1921, 192 Iowa 771, 185 N.W. 590, there was involved the sale of a piece of grain elevator equipment. The contract of purchase contained an express warranty that it would be made of good material by expert workmen in a workmanlike manner for elevator and warehouse ware and would be substantial and durable and would have a certain capacity. The machine did not operate satisfactorily. It did not have its warranted capacity. The Court held that the asserted implied warranty of fitness for the use intended was not necessarily inconsistent with the express warranties. In that case the evidence also tended to show a breach of the express warranty. In the case of Bucy v. Pitts Agricultural Works, 1893, 89 Iowa 464, 56 N.W. 541, 542, the order signed by the buyer contained the following provision:

" * * * 'The Pitts Agricultural Works warrant said machine to be of good materials, and to be well made; to do good work in threshing and cleaning grain, if properly managed. The condition of warranty is that notice of any defect is to be given the Pitts Agricultural Works at Buffalo, N. Y., within one week after putting the machine in operation.' * * *."

The buyer brought an action against the seller for breach of implied warranty of fitness for purpose. In the trial court the seller sought to introduce that provision into evidence. It claimed that it negatived the implied warranty asserted. The trial court refused to receive it into evidence. The seller recovered judgment. On appeal the judgment was reversed. The Iowa Supreme Court in referring to that provision stated (at page 542 of 56 N.W.):

" * * * It relates to the same subject and obligations that an implied warranty would, and, under the law, became the contract, to the exclusion of all implications as to that subject or those obligations. It directly negatived the existence of the implied warranty * * *."

In the case of Blizzard Bros. v. Growers' Canning Co., 1911, 152 Iowa 257, 132 N.W. 66, 67, one phase of the litigation had to do with the liability of a seed company for pumpkin seed sold by it. The purpose of the buyer was to raise pumpkins on a large scale which could be sold for canning purposes. The seed sold him produced pie pumpkins. They were not suitable for canning purposes. The packages of seed contained the following printed provision:

"Warranty. While we exercise great care to have all seeds pure and reliable and true to name, our seeds are sold without any warranty, express or implied, and without any responsibility in respect to the crop. If our seeds are not accepted on these terms, they must be returned at once."

The buyer did not notice this provision. The buyer asserted an implied warranty fitness for purpose against the seed com-

pany. He recovered judgment against it in the trial court. On appeal that judgment was reversed. The Iowa Supreme Court held the disclaimer provision barred the buyer's claim against the seed company.

The case of W. F. Dollen & Sons v. Carl R. Miller Tractor Co., 1932, 214 Iowa 774, 241 N.W. 307, involved the purchase of a second-hand tractor. The buyer, a contractor, purchased it for use in grading roads. It proved to be unsuitable for that purpose. The purchase order signed by the buyer contained the following provision: "No warranty on second-hand or rebuilt tractors." The buyer recovered judgment against the seller in the trial court for breach of implied warranty of fitness for purpose. On appeal the judgment was reversed. The Iowa Supreme Court stated (at page 308 of 241 N.W.):

"The theory advanced by the plaintiff is that there was nothing in the contents of the written warranty actually given, whether it be deemed to relate to the tractor or to other property only, that was inconsistent with an implied warranty. If this be so, then division 6 of section 9944 [Subsection 6, Section 554.16, Code of Iowa 1954, I.C.A.] becomes applicable. Such was the theory upon which the case was submitted to the jury. Under section 10000 [Section 554.72, Code of Iowa 1954, I.C.A.] it is permitted to the defendant to negative legal implications by express agreement to the contrary. The pivotal question in this case is whether an implied warranty, as described in section 9944, is *negatived* as provided by section 10000 by the declaration in the contract already quoted: 'No warranty on second-hand or rebuilt tractors.' We see no escape from the affirmative on this question. The statement here quoted, is direct and unambiguous. It quite exhausts the capacity of the English language in that direction. We can conceive of nothing that can be added to it for the indicated purpose. It must be said, therefore, that the written contract contained a definite negation of any implied warranty." (Words enclosed within brackets supplied)

A number of courts follow the rule that the words "no warranty" in a contract of sale do not negative implied warranties. Other courts, including the Iowa Supreme Court, follow the rule that they do.

In the recent case of Rotterman v. General Mills, Inc., 1953, 245 Iowa 229, 61 N.W.2d 718, at page 722, the Iowa Supreme Court stated:

" * * * The court must take an objective view in determining the parties' intent. It is not necessarily the actual intent we seek, but the intent manifested objectively. * * We seek the intent a reasonably intelligent person would derive from the expressions used * * *."

The courts are in general agreement that the words "no warranties expressed or implied" in a contract of sale effectively negative implied warranties. If it is the intention of a seller to exclude all warranties all that is necessary is to put those words in the contract of sale. It has been observed that "any tyro of a draftsman" could provide those words. See Prosser, The Implied Warranty of Mercantable Quality, 27 Minn.L.Rev. 116, 162, 163 (1943). A more difficult situation is presented to the draftsman where the seller desires to make a limited warranty as to the product sold by him and assumes certain responsibilities in connection therewith but does not desire to make any other warranties or assume other responsibilities. In such situations the draftsman cannot use the handy and effective words "no warranties express or implied" but must use words which will provide the buyer with the limited warranty intended by the seller and no other and which will limit the seller's responsibilities in connection with the article so warranted.

In the present case in paragraph 6(a) of the terms and conditions of sale it is specified that "The only warranty made

by the seller with respect to the products furnished under this order (except the warranty in 6(b).) is * * *." The balance of paragraph 6(a) and paragraph 6(b) relate to the supplying of the defective parts. The key words would seem to be "only" and "warranty."

In the case of Lumbrazo v. Woodruff, 1931, 256 N.Y. 92, 175 N.E. 525, at page 527, 75 A.L.R. 1017, the New York Court of Appeals states:

"When, therefore, in the contract of sale * * * in this case, the word 'warranty' is used, it has reference to those warranties defined in the Uniform Sales Act, unless it is otherwise expressed or restricted. * * *."

In the case of W. F. Dollen & Sons v. Carl R. Miller Tractor Co., supra, the word "warranty" used in a disclaimer provision of a contract of sale was held to encompass an implied warranty of fitness for purpose.

In the case of Dowagiac Mfg. Co. v. Mahon, 1904, 13 N.D. 516, 101 N.W. 903, there was involved a contract of sale of farm machinery which contained a provision that the seller "warranted" "only" against defects. In an action by the seller for the purchase price the buyer asserted among other matters that such provision did not exclude an implied warranty of fitness for purpose. The Court held that it did. The Court stated (at pages 903, 904 of 101 N.W.):

"* * * Giving the word 'only' its ordinary meaning, and applying it in its restrictive sense, as qualifying the word to which it naturally belongs, the conclusion cannot be escaped that it restricts the meaning to be given to the verb 'warranted.' * * * To construe it as limiting any other word would be a strained construction of the sentence. When read in its natural sense, the contract provides for a limited warranty of the goods sold. The contract having restricted the warranty intended to be made, all others that pertain to the same subject-matter are excluded. * * *.

"* * * * all the implied warranties pleaded are excluded from the terms of the contract by its restrictive words. * * *"

In the present case, as heretofore noted, the applicable law is that of the State of Iowa. In passing upon the question of the effect of the limitation clauses in controversy the determinative and pivotal question is what would the Iowa Supreme Court in light of its past decisions hold if presented with the same question.

■■■ The Iowa Supreme Court holds that the words "no warranty" are unambiguous and exclude the implied warranty of fitness provided by the Act. W. F. Dollen & Sons v. Carl R. Miller Tractor Co., supra. It would seem that the words "The only warranty" are equally unambiguous. It is the view and the holding of this Court that if the Iowa Supreme Court were presented with the question here presented it would hold that the words "The only warranty" in the setting used in paragraph 6 of the terms and conditions of the sale excluded the implied warranty of fitness for purpose asserted by the plaintiff.

While the foregoing holding would apparently render it unnecessary to proceed to the remaining issues between the parties, it is believed that it would be desirable that all the issues in the case be given consideration. One of the remaining issues relates to the matter of consequential damages.

The contract of sale in question provides in paragraph 6(c) of the terms and conditions of sale that save as to its liability in connection with the replacement of defective parts it "shall not be subject to any other or further liability * * * or for consequential damages * * *." In McElfresh v. Kirkendall, 1873, 36 Iowa 224, at page 226, the Iowa Supreme Court stated:

"Liability is responsiblity; the state of one who is bound in law and justice, to do something which may

be enforced by action. This liability may arise from contracts either express or implied * * *."

The provision referred to contains a disclaimer of responsibility "for consequential damages." In 25 C.J.S. Damages § 2, p. 455, in treating with the term "consequential damages" it is stated: "It has also been defined as synonymous with the term 'special damages.'" Section 554.71, Code of 1954, I.C.A., of the Iowa Uniform Sales Act provides, in part:

"Nothing in this chapter shall affect the right of the buyer or the seller to recover interest or special damages in any case where by law interest or special damages may be recoverable * * *."

The Act contains no reference to "consequential damages." The United States Court of Appeals for this Circuit has stated that there is confusion in the cases as to what constitutes consequential damages. United States v. Chicago, B. & Q. R. Co., 8 Cir., 1936, 82 F.2d 131, 136, 106 A.L.R. 942, certiorari denied 1936, 298 U.S. 689, 56 S.Ct. 957, 80 L.Ed. 1408. See also Fire Ass'n of Philadelphia v. Allis Chalmers Mfg. Co., D.C.N.D.Iowa 1955, 129 F.Supp. 335, 352, 353. Many contracts of sale contain a provision providing that the seller shall not be liable for consequential damages. In some situations that provision has proved to be of substantial benefit to the seller. In the case of Despatch Oven Co. v. Rauenhorst, 1949, 229 Minn. 436, 40 N.W.2d 73, the situation was that the seller had sold the buyer a seed-corn dryer. A provision in the contract of sale provided that the seller "assumes no liability for consequential damages." When sued for the purchase price the buyer asserted a counterclaim for breach of warranty and for negligence. In his counterclaim the buyer among other things asserted that the dryer failed to function in a proper manner and that as a result of such malfunctioning he was unable to dry a large amount of seed corn. He sought recovery for the damages sustained by him from the loss of sales of corn occasioned thereby. In his counterclaim the buyer also sought to recover damages for claimed negligence of the seller in cutting off part of the combustion chamber. The buyer recovered judgment in the trial court. On appeal the judgment was reversed. The Minnesota Supreme Court stated (at page 79 of 40 N.W.2d):

"* * *. The damages recoverable for breach of warranty are: (1) Such as arise naturally in the usual course of things from the breach itself; or (2) such as accrue as a *consequence* of the breach as the parties contemplated when making the contract. Frohreich v. Gammon, 28 Minn. 476, 11 N.W. 88. This is the rule of the famous case of Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint 145, 5 Eng.Rul.Cas. 502, which we have adopted. * * * The damages thus resulting as consequences are called 'consequential damages.' * * * A few examples will make clear what is meant. In Frohreich v. Gammon, supra, we held that the damages resulting in the usual course of things from a breach of warranty of a harvesting machine were the difference in value between the machine as warranted and the one delivered by the seller; that consequential damages (loss of crops caused by inability to harvest them because of breaches of warranty) were such as it might be reasonably supposed the parties contemplated would occur as a consequence of the breach * * *."

The Minnesota Court continues further (at pages 79 and 80 of 40 N.W.2d):

"* * * The purpose of the paragraph containing the clauses that plaintiff as seller 'shall not be liable' for certain liabilities and that it 'assumes no liability for consequential damages' was to define and limit the liability assumed by plaintiff as seller. * * * The 'consequential damages' include the loss of sales of both seed and feed corn occurring as a consequence of the alleged breaches of warranty. A clause in a sales contract providing

that the seller shall not be liable for consequential damages for breach thereof exonerates the seller from liability for such damages. * * *."

As appears from the above, the Minnesota Supreme Court follows the famous English case of Hadley v. Baxendale which defined consequential damages. The Iowa Supreme Court also follows Hadley v. Baxendale. See Mentzer v. Western Union Tel. Co., 1895, 93 Iowa 752, 62 N.W. 1, 28 L.R.A. 72.

█ In the present case the plaintiff seeks to recover damages for breach of warranty. The larger portion of the damages claimed by him is for the corn claimed to have been damaged because of such breach. Under the rule of Hadley v. Baxendale, as applied by the Minnesota Supreme Court, it would seem that that portion of the plaintiff's damages constituted "consequential damages" and recovery of such damages would be barred by the provision in the contract of sale in question. Since the Iowa Supreme Court follows Hadley v. Baxendale, it would seem that that Court would also so hold.

Another remaining issue relates to the spoilage of the corn. A great many of the facts relating to the construction, operation, and use of the bin have been heretofore stated.

█ In actions involving claimed breaches of warranty in connection with the sale of a machine the question as to whether it was a faulty machine and the question as to whether it was faultily operated by the buyer are inextricably entwined. That is the situation in the present case. Claimed fault on the part of the buyer in the operation of a machine purchased by him is sometimes referred to as negligence. However, as heretofore noted, negligence is not involved in actions for breach of warranty. Claimed fault on the part of the buyer in connection with the operation of a machine is connected with the matter of proximate cause and direct and natural result. Paragraph 6 of Section 554.70,

Code of Iowa 1954, I.C.A., of the Iowa Act provides:

"6. The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty."

It is the well established Iowa rule that in an action for breach of warranty the burden is upon the buyer to establish the breach claimed by him. Drager v. Carlson Hybrid Corn Co., 1955, 246 Iowa 957, 69 N.W.2d 58, 59; Kelly v. Emary, 1951, 242 Iowa 683, 45 N.W.2d 866, 869, 870. The case of Peet Stock Remedy Co. v. Bruene, 1930, 210 Iowa 131, 230 N.W. 327, had to do with cattle powders which were sold with a warranty that they would prevent bloat in cattle. The buyer recovered judgment in the lower court. On appeal the judgment was reversed for failure of the trial court to specifically instruct the jury that before the buyer could recover he must establish that the cattle in question "died as a result of clover bloat and not from any other cause." In the case of Broer v. Dr. Fenton's Vigortone Co., 1942, 231 Iowa 1276, 4 N.W.2d 416, at page 418, in an action by a buyer to recover for breach of warranty, the court stated the burden is upon the buyer to "establish the warranty, the breach and the damages. * * He was also required to prove that his loss resulted from the breach of warranty."

█ In the present case the burden was upon the plaintiff to establish by a preponderance of the evidence that the loss sustained by him for which recovery is sought was due to the defendant furnishing him a faulty bin. The defendant suggests most strongly that such loss was due to fault of the plaintiff in connection with the bin. A large amount of evidence was presented by the parties on this phase of the case.

The storage to be provided by the defendant's bin for high moisture content corn was of the hermetic or sealed type. There inhered in that type of storage the necessity of preventing the escape

of carbon dioxide and the replacing of it by oxygen. It was necessary to have a provision made for the discharge of the contents of the bin. Since such discharge would have to be made from the bottom of the bin and since the carbon dioxide would be concentrated there, it was critical and vital that the discharge equipment be installed and maintained in such a manner as not to permit the escape of any substantial amount of carbon dioxide. If any considerable amount of carbon dioxide were permitted to escape, it would be replaced by oxygen and the microorganisms in the bin would start respiring and spoilage of the corn would ensue. If any opening at the bottom were left open for any appreciable length of time, the greater part of the carbon dioxide would escape.

The type of discharge equipment which the defendant sold for use in connection with the bin was of the auger type. When that type of equipment is used a tube containing an auger is inserted through a hole near the bottom of the bin. That tube and auger project a distance outside from the bin. At the end of the tube inside the bin there is a lid which can be raised by a rod projecting to the outside to permit the entrance of corn into the auger. At the end of the auger tube outside there is a lid of the gasket type. Normally a small amount of carbon dioxide would escape when the auger is in operation, but if the gasketed lid at the outside end of the auger tube is kept tightly closed before and after augering operations the amount that will escape in connection with them should not be of serious proportions. At the time the bin in question was turned over to the plaintiff there was a hole at the bottom sealed with a bolted cast iron plate. That hole was provided for discharge purposes. If there is no corn in the bin at the time the discharge equipment is installed the length of time the hole referred to is left open is not of consequence. If, however, there is corn in the bin and the hole is left open for any substantial length of time the accumulated carbon dioxide will escape and spoilage

will ensue. If the gasketed lid at the outside end of the tube containing the auger does not seal properly when closed, or is left open at times when augering operations are not in progress, or if the fittings used in connection with the discharge equipment are not tightly fitted, a substantial amount of carbon dioxide may escape and spoilage ensue. The discharge equipment sold by the defendant was such that it could be inserted through the hole provided for such equipment and bolted in the opening without the opening being open for any appreciable length of time. As heretofore noted, the plaintiff did not choose to purchase the discharge equipment sold by the defendant for use in connection with the bin. On or about November 25th, 1955, after corn had been stored in the bin for approximately two months, the plaintiff proceeded to install discharge equipment of his own devising and of local fabrication. In connection therewith the plaintiff removed the cast iron plate which sealed the hole provided for discharge equipment and left the hole open over night. It would seem that during the period the hole was open the carbon dioxide in the bin would have escaped and would have been replaced by oxygen.

■■ There was a considerable amount of evidence presented relating to the question as to whether the fittings devised and installed by the plaintiff were sufficiently tight to prevent the escape of an undue amount of carbon dioxide. There was a considerable amount of evidence presented relating to the question as to whether the lid at the outside end of the auger tube was properly gasketed and as to whether it was left open when augering operations were not in progress. There was a considerable amount of evidence presented bearing on the over-all question as to whether the spoilage of the corn was due to the plaintiff being furnished a faulty structure so far as the storage of high moisture content corn for feeding purposes was concerned. A consideration of all the evidence leaves the Court with the impression that it is

inconclusive on that question and that it presents an unclear picture and leaves the cause of the spoilage uncertain and doubtful. The Court is of the view that it cannot be found that the plaintiff has established by a preponderance of the evidence that the cause of the spoilage was due to his being furnished with a faulty structure for the storage of high moisture content corn for feeding purposes.

The situation then is that the plaintiff did not establish that the defendant breached the asserted warranty of fitness of the bin for the storage of high moisture content corn for feeding purposes but he did establish a breach of the asserted warranty of fitness of the bin for the storage of high moisture content corn for sale in commercial channels. Therefore, apart from the contractual limitations referred to, the plaintiff could assert a claim for the damages sustained by him for such breach. If the question as to that breach of warranty were reached, the matter of damages would present some troublesome problems.

Section 554.70, Code of Iowa 1954, I.C.A., of the Iowa Act provides, in part, as follows:

"1. Where there is a breach of warranty by the seller, the buyer may, at his election: * * *

"b. Accept or keep the goods and maintain an action against the seller for damages for the breach of warranty. * * *

"5. Where the buyer is entitled to rescind the sale and elects to do so, if the seller refuses to accept an offer of the buyer to return the goods, the buyer shall thereafter be deemed to hold the goods as bailee for the seller, but subject to a lien to secure the repayment of any portion of the price which has been paid * * *."

Those provisions are in accord with the pre-existing Iowa common law. H. C. Horack, The Uniform Sales Act And Its Effect Upon The Iowa Decisions And Statutes, 3 Iowa Law Bulletin 67 (1917).

In the present case the plaintiff has not rescinded or attempted to rescind the contract of sale because of breach of warranty. He seeks to recover the entire purchase price. Such recovery is usually sought by a buyer who has rescinded. It is the well settled rule in Iowa that one who seeks to recover the purchase price paid on account of a breach of warranty must show a return or offer to return the warranted article. Hoffman v. Independent Dist., 1895, 96 Iowa 319, 65 N.W. 322. The plaintiff testified that he was willing to allow the defendant to disassemble and remove the bin "if they pay me for it." He further testified that the bin was of no value to him. The plaintiff's claim for damages as to the bin itself is based on breach of warranty. In such a case the plaintiff's measure of damages as to the bin would be the difference between its value if as warranted and its actual value. In a situation where the article sold has only nominal junk value, that difference would be equal to the purchase price. That is not the situation in the present case. The bin is a substantial steel structure which could be disassembled. It apparently could be re-erected on another farm. At least the steel in it would have more than nominal junk value. There is lacking evidence from which a determination could be made as to damages, i. e., the difference between the value if as warranted and its actual value. It should also be noted that the plaintiff's evidence as to damages was bottomed upon the theory that he had established a breach as to both phases of the warranty. He established a breach as to one phase only. Because of that situation, it would not be possible to determine what his damages would be as to that phase.

The foregoing opinion will constitute the findings of fact and conclusions of law herein. Rule 52(a) Federal Rules of Civil Procedure, 28 U.S.C.A.

It Is Ordered that judgment shall be entered in favor of the defendant.