The **PFAUDLER COMPANY**, a corporation, Plaintiff,

v.

**AMERICAN BEEF PACKING COMPANY**, a Corporation, Defendant.

Civ. No. 3–745–W.

United States District Court,
S. D. Iowa, W. D.

Feb. 18, 1972.

Gaines, Spittler, Neely, Otis & Moore, Omaha, Neb., Hess, Peters, Sulhoff & Walker, Council Bluffs, Iowa, for plaintiff.

Fitzgerald, Brown, Leahy, McGill & Strom, Omaha, Neb., Hogzett & Burgett, Oakland, Iowa, for defendant.

## MEMORANDUM AND ORDER

HANSON, Chief Judge.

This action is a suit by The Pfaudler Company, a Corporation, having its principal offices in Rochester, New York, (hereafter called Pfaudler) to recover from American Beef Packing Company (hereafter called American Beef) the balance remaining on a contract by which Pfaudler agreed to design and provide the engineering services and equipment for a rendering system to be installed in the American Beef Packing plant in Oakland, Iowa. The plaintiff demands judgment in the amount of $91,-148.54, together with interest from June 13, 1967, and the costs of the action.

The defendant asserts by way of answer that the consideration for its promises has failed, that plaintiff has failed to substantially perform its obligations, and that defendant has offered and tendered the system back to plaintiff. Further, the defendant asks return of the portion of purchase price paid.

Defendant counterclaims alleging that by reason of Pfaudler's failure to satisfy the contractual requirements, American Beef is not only entitled to recover the portion of purchase price paid by it, $69,-580.00, together with expenses incurred for parts, labor and other expense in attempting to make the system work, but also the value of products lost through the improper operation of the system in the sum of $100,000.00. In all, it claims $169,580.00.

The case was tried to the Court and the Court hereby makes the findings as hereinafter set out.

Historically speaking, one can glean from the evidence offered that prior to 1966, Pfaudler developed the "Lycoil" continuous rendering system. It is likewise obvious that a proper system of some type to dispose of inedible product and for conversion to marketable product must be in being at all times for the operation of the packing plant industry. It was clearly indicated from the evidence that the plaintiff was representing the so-called "Lycoil" system as one that would perform properly in the American Beef system. It seems the primary feature which distinguishes this system from other rendering systems is that it is a continuous flow system, that is, bones, entrails and other materials, which are natural waste materials of a packing plant, are deposited in a large hopper at the beginning of the system. The material leaves the hopper by an automatic conveyor and is transported through a series of pipes, pumps and machines which grind, heat, separate, purify and dry the material. All of this is demonstrated in Exhibit #6.

The final result is the production of dried meat scraps on the one hand, which are sold primarily for use in livestock feeds, and a liquid tallow on the other hand, which is sold for a variety of commercial uses including soap making, etc. Ideally, the entire process is performed without manual transfer from one stage to another, the transfer being accomplished on a continual basis by pumps and by the force of gravity. The natural advantages of this system are proclaimed to be a decrease in the amount of labor required, a superior product, and a cleaner and more odor-free plant, since the system is, in many of its steps, enclosed.

Although prior to 1966, Pfaudler had produced and sold several of these systems, none of the systems seems to have been of a capacity as large as the capacity ultimately sold to American Beef. The workability of the other systems sold is vague to the Court by reason of the lack of evidence introduced.

It appears from the evidence that during 1965 and early 1966, representatives of Pfaudler and American Beef had a series of discussions and exchanged a number of proposals for systems of varying sizes. Finally, during April of 1966, the parties signed the agreement upon which this suit is based, dated April 18, 1966. This agreement is evi-

denced in the record by plaintiff's Exhibit #1.

However, plaintiff's Exhibit #2 also shows an unexecuted proposal of similar content on October 8th, 1965. The defendant in its answer asserted the existence of subsequent oral warranties on behalf of Pfaudler, but at the trial, evidence of these warranties on behalf of Pfaudler was not introduced nor received and consideration of them was withdrawn from the Court.

The more important provisions of the contract, Exhibit #1, are as follows:

"We propose to design or specify and supply the equipment and engineering services outlined below under 'Scope of Work' for a system to render mixed packing house waste inedible material at the following maximum rates:

Feed _____ 15,000 pounds per hour
Meat Meal ____ 3,450 pounds per hour
Tallow _____ 4,050 pounds per hour

The system we propose to furnish is shown on Flow Diagram EB–3522–1–2 dated October 8, 1965."

"PRICE

The price for the equipment and engineering services supplied by us: $160,-450.00."

"WARRANTY

Pfaudler warrants that the equipment furnished, when installed in accordance with instructions to be furnished by Pfaudler will be capable of rendering up to 15,000 pounds per hour of mixed packing house inedible, the inedible tallow output not exceeding 4,050 pounds per hour and the meat meal not exceeding 3,450 pounds per hour. We also warrant that the dryer will be capable of drying drained paunch contents provided customer supplies adequate means of feeding paunch material to dryer in accordance with Pfaudler specifications."

"Unless Pfaudler is advised in writing to the contrary within 30 days after start-up of plant, the plant will have been presumed to have met the warranty to purchaser's satisfaction.

If the warranty is not met and Pfaudler is so notified in writing to this effect, Pfaudler will have an additional period to recommend modifications to the equipment or processing, and/or specify and supply at Pfaudler's expense replacements or additions to the equipment already installed. Purchaser agrees to make the modifications and installation of additional and/or replacement equipment at purchaser's expense and according to Pfaudler's instructions.

Purchaser also agrees to remove and return any existing equipment at purchaser's expense freight prepaid to any factory in the United States designated by Pfaudler. If the plant then fails to meet the warranty, purchaser agrees to remove and return the equipment at his expense to the United States location designated by Pfaudler. Upon receipt of the equipment in good condition Pfaudler will refund purchaser the full contract price paid and such refund shall operate as a full and final discharge of Pfaudler of all of its liability hereunder."

"PAYMENT TERMS

25%—cash with order

65%—net 15 days from date of invoices evidencing shipment of equipment

10%—after meeting demonstration test"

"TERMS AND CONDITIONS

4. TITLE. Title to the equipment described herein shall not pass to Purchaser, but shall remain in Pfaudler, until such time as Purchaser has paid to Pfaudler all amounts due hereunder."

This is not to say that all other provisions are not to be considered but the Court will refer to them as the occasion requires.

Subsequent to the execution of the contract, plans for the system were finalized, the equipment was shipped to American Beef and the system was installed by it. Initial start-up of the American Beef plant at Oakland, Iowa and the rendering

system began on or about December 16, 1966.

Even from the evidence of the plaintiff itself, it would be to ignore the record evidence to say the Pfaudler system was not plagued with innumerable problems. At Pfaudler's suggestion, many changes in the system were made. Even at the time of their last futile efforts to make the system perform, they were suggesting new and different types of elements. Additional equipment was ordered to supplement or to entirely supplant or add to the equipment initially recommended. It is significant to note these changes and alterations continued for at least 6 months or longer. In the meantime, American Beef had no alternative but to limp along with the problems other than shut the plant down or obtain new system or suffer exorbitant consequential damage.

The actual problems encountered with this system consisted, for the most part, in the inability of the system to handle the volume of material required under its anticipated capacity. As a result, the elements broke down, the product was of no value, and the material overflowed onto floor of the plant. To compensate for the lack of sufficient capacity and other problems, it was often necessary to operate the system after the plant itself had shut down for the day. Quantities of the unsalable products were either destroyed, dumped or re-run through the system. It is found the system was most of the time plagued with breakdowns and failures of the equipment involved.

In addition to these findings, a referral is made to the testimony of witnesses produced at trial and more particularly those of the plaintiff as it relates to the start-up of the plant and attempted solutions of various problems. The very first witness was one Walter Swanton, a Pfaudler engineer, who frankly stated in substance that his expertise and responsibility was somewhat limited to the mechanical operation of the system and its various parts, and that his expertise did not extend to the actual process involved in utilizing the system to render waste products into salable products. It does appear that he was there at least on or before November 18, 1966, and continued with other visits with relation to start-up and correcting installation. His last visit appears to have been about January 14, 1967. A fair estimate of his testimony could only cause one to conclude that it does sustain the findings of this Court.

It appears that the witness George Vandermark was engaged by Pfaudler as what is commonly referred to as a "troubleshooter." There was great question in this Court's mind as to his competence to adjust, evaluate or alter the system.

Mr. Morris Grunner and Mr. Emmanuel Dufault were Pfaudler engineers who visited the plant on occasion for short periods of time. In substance, their testimony only confirms troubles with the system. On the other hand, Dufault in late February 1967 spent some four or five days supervising its operation and making certain tests which will hereafter be referred to in more detail. Even though mindful of problems he observed and the tests taken, he reached certain conclusions and made recommendations relating to the operation of the system. In summary, he said the system was capable of performing, as required by the contract and the problems which existed, aside from certain alterations which he recommended and which he considered minor, resulting from (a) equipment utilized to feed raw materials into the system which Pfaudler asserted was not an area of its responsibility, and (b) the improper operation of the plant by American Beef.

In these findings, perhaps even more should be stated with relation to the tests and measurements made. These were made under the supervision of the witness Dufault during a period between February 28, 1967 and March 8, 1967. These tests and measurements lack validity not only because of methods used but for the further reason that the results were entirely inconclusive. Actually they belie the performance of the express contract. Those tests are unreliable and

afford absolutely no probative value. Under the circumstances here they offer no foundation for saying the system was properly functioning. Mr. Dufault attempted to render a conclusion that on the basis of his experience, he could observe the operation of the system and estimate the amount of material the system was handling on an hourly basis. This conclusion is without foundation and has no probative value.

The final gasp of this collossal failure seems to jell in two letters. The first is evidenced by a letter written by M. E. Grunner, Rendering Systems Manager of Pfaudler on June 23, 1967. (Defendant's Exhibit D–21). The other is a reply evidenced by a letter dated July 17, 1967, written by F. R. West, Chairman of the Board of American Beef. (Plaintiff's Exhibit No. 8). In these exhibits, both parties set forth their positions. It is now clear that Pfaudler was saying they had performed and wanted payment, and just as vigorously, American Beef denied performance. American Beef then began arrangements for the ordering and installation of a replacement system, and on the 20th day of September, 1967, Pfaudler instituted this suit. It appears that American Beef attempted to continue the operation of the plant with Pfaudler's system until the new system was complete in January, 1968. Neither party made arrangements for the return of the merchandise at once. However, American Beef has tendered return in their Answer to Pfaudler's Complaint. Except as additional findings may be necessary in the conclusions hereinafter drawn, the above mentioned matters it is believed will suffice.

■ After considering the totality of the evidence presented by the plaintiff, the Court finds that the plaintiff has entirely failed to prove that it has performed its contract to provide a rendering system as guaranteed under the express terms of the contract. The evidence in fact establishes that the system, as furnished, did not satisfy the contract requirements with respect to quantity or quality of performance. The evidence here adduced by the plaintiff itself can lead to no other conclusion than that the conditions of the contract are unfulfilled.

If the plaintiff wished to recover the balance of the purchase price, the burden was upon it to prove that it had performed its obligations as required by the contract. This contract clearly obligated Pfaudler "to design or specify and supply the equipment and enginering services . . ." for a system to render mixed packing house waste inedible material at the following maximum rates:

| | |
|---|---|
| Feed | 15,000 pounds per hour |
| Meat Meal | 3,450 pounds per hour |
| Tallow | 4,050 pounds per hour |

It will be noted that this is not simply a contract to provide certain specified equipment. On the contrary, the design and engineering of the system to accomplish the stated results is the essence of the contract. The specification of individual pieces of equipment, the grouping of them, the furnishing of operating manuals and instructions are all part of Pfaudler's obligation, and if the equipment, when assembled and installed, was not capable of performing as a system as specified, the plaintiff cannot escape the consequences of that failure by simply pointing out that the equipment listed in the contract was furnished.

It would seem from the tone of argument of counsel in brief that the express warranties and disclaimers within the contract preclude the defense of a worthless rendering system. This Court would be loath to hold that the expressions contained within warranties here set out do not permit redress for an unworkable rendering system. To hold otherwise would be totally repugnant to the clear purport of the primary contract.

■ The plaintiff seems to assert that it is not responsible under the contract for a system which will produce a salable commodity. With this premise, this Court cannot agree. The contract requires the plaintiff to design and furnish a "rendering system." All agree the definition and purpose of rendering is to convert what would otherwise be waste

materials to be disposed of, into meat meal and tallow which can be sold and used for commercial purposes. A system which merely converts useless waste material into equally useless meat scraps and tallow cannot be considered to have "rendered" that material in any meaningful sense and cannot have been intended by the parties. Finally, the contract requires the system to be capable of handling certain amounts per hour (as herein set out) and producing meat meal and tallow at the stated rates. The burden is upon the plaintiff to prove that the system which it designed and furnished was capable of rendering at the rates stated. Anything less than this is not a performance of its contract.

■ It is well to state at this juncture of the opinion and before delving too deeply into the governing law, that both parties concede there are no jurisdictional and no conflicts of law problems. Both parties subscribe to the rule of law that a contract is to be construed and given effect pursuant to the law of the state of performance. 17 C.J.S. Contracts § 12(5).

At the time this contract was executed in 1966, the Iowa Sales Act was in force. The Uniform Commercial Code of Iowa became effective July 4, 1966, and was made effective after this date. (Section 554.10101). The pertinent provisions of the Iowa Sales Act in effect prior to July 4, 1966, are found in sections 554.12, 554.13, 554.16, 554.64 and 554.70.

The teachings of some Iowa cases related to the matter of performance are relevant and revealing as to the posture of this litigation. The case of Central Wisconsin Supply Co. v. Johnston Bros. Clay Works, 194 Iowa 1126, 190 N.W. 961 (1922), in which the plaintiff contracted to supply "two-inch Harrisburg, Illinois lump coal" is applicable. The Court held that evidence which merely showed the delivery of "coal" did not make a prima facie case. The Court said:

"The plaintiff sues to recover the price of coal which defendants are alleged to have ordered, but refused to receive or pay for. That the order was made and defendants did refuse to receive or pay for the coal sent is admitted, but to entitle plaintiff to recover it has the burden of showing a full, complete, and substantial performance of the contract on its part. The mere existence of a contract gives no right of action. Such rights exist only when the plaintiff has performed or duly tendered performance on his part.

\* \* \* \* \* \*

The order in question was given October 18, 1919. It is couched in unequivocal terms and calls for 'five cars Harrisburg, Ill., 2″ dump coal, three twenty-five per ton.' It is not a simple general order for 'coal', or 'Harrisburg' coal, or 'lump' coal, but for 'two-inch Harrisburg, Ill., lump coal,' and proof of performance or tender of performance must show a delivery or offer to deliver the thing ordered 'two-inch Harrisburg, Ill., lump coal.' We think it very clear that the record entirely fails in proof of that fact.

\* \* \* \* \* \*

Counsel seem to argue that the plaintiff's evidence does tend to show that the shipment was 'coal' and was sent from Harrisburg, and that this sufficiently fills the bill.

\* \* \* \* \* \*

To make a prima facie case as against defendants' denial the burden is on plaintiff, as we have already pointed out, to make affirmative showing of its own performance or tender of performance, and until then the question whether defendants had a valid reason for refusing to receive the coal is immaterial. Such showing not being made, defendants were not put upon their defense, and the trial court did not err in directing a verdict."

Indeed the result is dictated by the old Iowa Sales Act, Section 554.12(2), which is applicable because the contract reserves title in the plaintiff until price is paid. That section provides:

"(2) Where the property in the goods has not passed, the buyer may treat

the fulfillment by the seller of his obligation to furnish goods as described and as warranted expressly or by implication in the contract to sell as a condition of the obligation of the buyer to perform his promise to accept and pay for the goods."

What will constitute substantial performance will vary from contract to contract; but the contract here leaves no room for speculation. In McMillan v. Jaeger Mfg. Co., 177 Iowa 599, 159 N.W. 208 (1916), the plaintiff agreed to install a smokeless furnace for the defendant and, at the trial, failed to prove that the furnace had met the requirement stipulated. The Court in holding the burden to be upon the plaintiff stated the following:

"This conclusion does not, as appellee seems to think, involve or suggest a rule that the seller of warranted goods, suing to recover the agreed price, is bound to negative any breach of the warranty. Such breach, if any, is ordinarily a matter of defense or counterclaim, the burden of alleging and proving which is upon the buyer. Here, however, the plaintiff declares upon an express contract by which it is agreed that the price should become due and payable only upon the installation of a furnace which should accomplish a certain result to the satisfaction of the city's inspector, and it cannot recover upon such contract without a showing of performance in substantial accordance with its terms. The difference is well noted in Hoffman v. [Independent School Dist. of] Hampton, 96 Iowa 322, 65 N.W. 322, where the court placed the burden on the defendant to allege and prove a breach of warranty, but in the same connection it recognized the other rule that parties to a contract to furnish or supply machinery may well stipulate as to its character, quality, or capacity in such manner that affirmative proof of performance in that respect becomes a condition precedent to a recovery of the price."

The rule above announced is generally followed in other jurisdictions. The general rule was stated in Glass v. Wiesner, 172 Kan. 133, 238 P.2d 712, 716 (1951), wherein the court said:

"When the principal object of a contract is to obtain a result, there has been no compliance with the contract until the result has been obtained.

Where the contract contains a guaranty or warranty, express or implied, that the builder's work will be sufficient for a particular purpose, or to accomplish a certain result, unless waived by the owner, the risk of accomplishing such purpose or result is on the builder, and there is no substantial performance until the work is sufficient for such purpose or accomplishes such result."

9 C.J. 745 [City of McPherson v. Stucker] 122 Kan. 595 at page 600, 256 P. 963 at page 966.

■ The plaintiff for other aspects of this case relies heavily upon the case of Rasmus v. A. O. Smith Corporation, 158 F.Supp. 70 (N.D.Iowa, W.D., 1958). The court there said among other matters which will hereinafter be considered, as follows:

"The Iowa Supreme Court has observed that the sale of a grist mill that will not grind, of a reaper that will not reap, and of a furnace that heats nothing but the owner's temper leaves much to be desired in the way of a business transaction. Ideal Heating Co. v. Kramer, 1905, 127 Iowa 137, 102 N.W. 840, 841."

For all these reasons as herein announced the plaintiff is not entitled to recover the purchase price.

Having now concluded the plaintiff's main case, the defendant's defense and counterclaim must be resolved. In addition to this resolution, plaintiff's defense to counterclaim must be considered and finally the ultimate judgment.

■ Certain facets of the defendant's counterclaim are disposed of without difficulty. The defendant claims for its damage for loss of product and its labor

and other expenses incurred in attempting to make the system work correctly. These are what may be referred to as consequential damages. There are two profound reasons for denial. The first instance involves the proof offered; the record here is clearly barren of sufficient proof to prove the amount of these damages which is clearly enough in itself. Secondly, damages of this type are expressly excluded by the contract. It is here that the teachings of Rasmus v. A. O. Smith Corporation, *supra,* are clearly applicable.

The only question remaining then is: What remedy is available? The plaintiff says it wants the purchase price, which this Court has denied for failure of performance. The plaintiff makes no claim for the return of the system and has made no quantum meruit claim in the alternative for its value nor offered any proof of present value. On the other hand, it says American Beef has waived any claim it has by reason of use, and further American Beef has not made a tender of return within a reasonable length of time. The defendant argues that by the terms of the contract, it not only has properly tendered the system back, but is entitled to a return of the $69,580.00 already paid on the contract.

Although much is said concerning recission of the contract, actually, the contract provides the method for resolving the impasse reached in this case.

In this connection, the contract provides that plaintiff is to be given notice of defects in the system and an opportunity to correct them. It then provides:

> "If the plant then fails to meet the warranty, purchaser agrees to remove and return the equipment in good condition, Pfaudler will refund purchaser the full contract price paid, and such refund shall operate as a full and final discharge of Pfaudler of all of its liability hereunder."

Thus the Court must address itself to the problem of waiver.

> "Waiver is the intentional relinquishment of a known right; it is the expression of an intention not to insist upon what the law affords. It is consensual in its nature; the intention may be inferred from conduct, and the knowledge may be actual or constructive, but both knowledge and intent are essential elements."

Commercial Ins. Co. of Newark v. Burnquist, D. C., 105 F.Supp. 920, 938.

There can be no doubt that under the Federal Rules of Civil Procedure (Rule 8(c)) waiver is an affirmative defense and must be pleaded and proved. United Forest Products Co. v. Baxter, et al., 452 F.2d 11 (8th Cir., December 9, 1971); Telex, Inc. v. Schaefer, 233 F. 2d 259 (8th Cir. 1956).

■ A careful examination of the pleadings by the plaintiff fails completely to plead or urge this defense. This alone precludes the defense urged.

■ If we are to revisit the facts of this case, it is apparent from the position taken by Pfaudler in its letter of June 23, 1967 and from the testimony of its representative at the trial that Pfaudler had taken the position that the system did perform as required by the contract, and that Pfaudler would not have been willing to accept a return of the equipment or to designate a location to which the equipment should be returned pursuant to the contract. It is abundantly clear that Pfaudler was not prepared or willing to return purchase price to defendant. Under these circumstances, American Beef was under no obligation to actually ship the equipment immediately to Pfaudler. The law does not require the doing of a needless act. Lake v. Western Silo Co., 177 Iowa 735, 158 N.W. 673. See Henriott v. Main, 225 Iowa 20, 279 N.W. 110 (1939).

The Court does not discern that the contract is specific as to time when the product should be returned. The Court does find from evidence and circumstances in the case that the defendant has tendered back the system within reasonable time after it was found defective.

What is to be considered a reasonable time must be judged in the light of all circumstances. In this case the evidence shows that American Beef co-operated and made all changes suggested by Pfaudler up until the letter of June 23, 1967. The Suggestions by Mr. Grunner were for additional changes, but took the position that the Pfaudler system, as such, operated as required and that the changes were matters outside the scope of the Pfaudler contract. He stated that Pfaudler was willing to co-operate in making additional changes, but only upon condition that American Beef complete payment of the balance remaining unpaid under the contract. To have done so would have been a final acceptance of the system and an admission that the system had met the test which the contract required as a condition toward final payment. Under the conditions and circumstances, American Beef refused to accept the system, and Mr. West in his letter of July 17, 1967, informed Pfaudler that it was removing the system as soon as possible and would inform Pfaudler of its damages. Although the letter of West did not say so in so many words, there is an implication of tender.

■ The evidence does disclose that American Beef continued to attempt the use of the Pfaudler system but only during the time it was obtaining and installing a cooker-expeller system as replacement. The evidence discloses, further, that without some means of rendering its waste products during this hiatus, it would have been necessary to have closed its plant, which could only have occasioned a greater financial damage. No one has said that American Beef did not do its best to get the unworkable system out and the new one installed. Actually, the new system was installed by January of 1968 which seems to have been as soon as possible. In September 1967 the plaintiff started its lawsuit and the defendant tendered the equipment in its pleadings. Under these circumstances, the defendant removed the system and tendered it back within reasonable time.

The plaintiff has belatedly raised the question of use of the system after July 17, 1967 and until January 18, 1968. This defense was never pleaded. Nevertheless, the Court believes he should cover the issue.

■ It is the contention of plaintiff that the use referred to constitutes a waiver. The plaintiff in support thereof cites 77 A.L.R. 1165 along with certain Iowa cases as will be herein referred to subsequently. The proposition of law is set out in 77 A.L.R. page 1167, and is subsequently further annotated in 41 A.L.R.2d 1175. The rule of 77 A.L.R. page 1167, is as follows:

It is well settled that a purchaser of personal property may waive or lose the right to rescind the contract for fraud, breach of warranty, or failure of the article purchased to conform to the contract, if he uses it in his business or otherwise as his own property, for his own benefit or convenience, and not merely for testing or preserving it, after he has knowledge of the grounds for rescission.

Then again on page 1189, it is as follows:

The question whether use of a chattel by the purchaser will preclude rescission as matter of law, or whether the question is for the jury, depends to such an extent on the particular facts that no general rule can be laid down. Generally, reference is made to the various subdivisions of the annotation in which, in the statements of the cases, their conclusions on this point are indicated. It seems sufficient at this point merely to cite several representative cases in which the question was distinctly presented.

It will be noted in 41 A.L.R.2d page 1195, the same point of law is again made. The case of Bales v. Massey (1950), 241 Iowa 1084, 43 N.W.2d 671, is cited in support thereof. Thus it becomes clear that the particular facts of each case must be considered as to whether there may or may not be a waiver.

■ In this case we have a packing plant with huge operation and large in-

vestment involved. The matter of proper disposition of inedible product is critical in the operation if it is to survive. No doubt it could continue to unsatisfactorily operate in some manner under the Pfaudler system. After determining that the system of Pfaudler would not perform to specifications, it proceeded with dispatch under the circumstances to remove and install a different system. The time utilized for installation was entirely reasonable. The Court cannot find one element necessary to establish that American Beef was intentionally waiving a known right it had under the terms of the contract. The findings of fact and conclusions to be drawn lead to no other avenue than that the defendant here did not waive recourse by use.

The case of United States Hoffman Machinery Corp. v. Carlson, 253 Iowa 304, 111 N.W.2d 271 (1961), was one where the seller sued to foreclose a conditional sales contract. In that case, the defendant claimed rescission and counterclaimed for damages. It is fair to note here that the buyer continued to use the cleaning equipment after using it for four years, including three years after the last effort of seller to remedy a defect in the equipment. It is completely understandable that judgment would be entered for plaintiff and affirmed by the Supreme Court.

The Court analyzed many Iowa cases on the subject and quoted from Chariton Plumbing & Heating Co. v. Lester, 202 Iowa 475, 210 N.W. 584. In that case, the Court said:

"Ordinarily, of course, whether or not rescission was timely is for the jury to decide, but as held in the cases cited above, the delay may be so great as to require the court to hold as a matter of law, that it was not within a reasonable time. Appellant, according to his own testimony, knew during all of the time and for more than a year, that the belt would come off, and that the plant was not satisfactory. Nothing appears to have been done by appellee to induce appellant to retain the system or to prevent timely rescission.

Under the facts disclosed, the question was for the court and not [for] the jury. The delay was unreasonable, and no satisfactory excuse was shown therefor."

The action in this case is totally in accord with decisions rendered under Iowa law.

In conclusion, therefore, the Court finds that judgment should be entered generally for the defendant and against the plaintiff, that the petition of plaintiff be and is hereby dismissed, and that judgment be entered in favor of defendant in the amount of $69,580.00, together with interest from date of judgment, each party to pay one-half of the costs taxed, and that the defendant be, and hereby is ordered to ship the equipment furnished to it by plaintiff to such location as may be designated by the plaintiff.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and order for judgment in this case under Rule 52(a) of the Federal Rules of Civil Procedure.